NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-2869
_____

UNITED STATES OF AMERICA

v.

TRANCE KALE,
also known as
TRIZ

Trance Kale,
                    Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-09-cr-00264-003)
District Judge:  Honorable John R. Padova
_____

Submitted Under Third Circuit LAR 34.1(a)
September 20, 2011

Before:  FISHER, HARDIMAN and GREENAWAY, JR., *Circuit Judges*.

(Filed: September 20, 2011)
_____

OPINION OF THE COURT
_____

HARDIMAN, *Circuit Judge*.

Trance Kale appeals his conviction following a jury trial. We will affirm.

I

Because we write for the parties, we review only the essential facts and we do so in the light most favorable to the Government as the verdict winner. *United States v. Hoffecker*, 530 F.3d 137, 146 (3d Cir. 2008).

On August 25, 2009, a federal grand jury returned a thirteen-count superseding indictment charging Kale, along with co-conspirators James Heath, Kerry Young, and Aaron Conquest, with a string of Hobbs Act robberies and related offenses. These charges stemmed from a series of robberies that occurred in November 2008 in Philadelphia. Although the Government alleged that Kale was involved in four such robberies, the jury convicted Kale of offenses relating to two: the robbery of Davis Pharmacy on November 11, 2008, and the robbery of Haussemann Pharmacy on November 18, 2008.

On the morning of November 11, 2008, Kale and co-conspirators Young and Conquest robbed Davis Pharmacy at gunpoint, stealing a number of prescription drugs, including Oxycontin and Percocet, a briefcase with a laptop computer, and a pharmacist's wallet. During trial, Young and Conquest testified that Kale planned the operation, that he drove them to the pharmacy in his girlfriend's silver Malibu, and that he carried a .40 caliber handgun. Although the employees at Davis Pharmacy could not identify Kale, a

2

bystander outside the store testified that he saw three men with guns run out of the pharmacy and jump into a silver car. Moreover, Kale's mother and sister testified before the grand jury that Kale, Young, and Conquest arrived at their home later that morning to announce that they had just conducted a "sting" of a pharmacy. Kale instructed Young to give bank checks found in the stolen briefcase to Kale's mother so she could "mess" with them. Kale's mother used these bank checks to pay a number of household bills, and the subsequent discovery of these fraudulent payments led to the instant prosecution.

Following the "sting" of Davis Pharmacy, Kale sent a text message to his childhood friend in New Jersey, Joseph Buonanno. Buonanno was addicted to Percocet and Kale offered to sell him the pills they had stolen from the pharmacy. That evening, Kale called Buonanno several times. Jeff Strohm, a custodian of records at Sprint Nextel Communications (Sprint), testified that Kale's cell phone used signals from a cell tower located in Pennsauken, New Jersey, and that "the biggest indicator" of which tower has the strongest signal is "distance." During closing arguments, the prosecutor reminded the jury of this witness's testimony, stating that Kale's phone "was being used in New Jersey, not just in the State of New Jersey, but in the area of Joseph Buonanno's residence that evening." Buonanno, as well as Young and Conquest, also testified that Kale drove to Buonanno's home that evening and sold him 100 Percocet pills for $500.

On November 18, 2008, Conquest, Young, Heath, and Kale robbed Haussemann Pharmacy in Philadelphia. Kale's co-conspirators testified that Kale supplied a pistol and

3

waited in the getaway car outside the pharmacy. Following the robbery, Kale once again called Buonanno and offered to sell him Percocet. Cell phone records indicate that Kale called Buonanno several times that evening using a cell phone tower in Pennsauken, New Jersey.

Kale's trial counsel argued that Conquest, Young, and Heath lied under oath to comply with their plea agreements and that Buonanno lied to obtain immunity from prosecution. During closing arguments, the Government responded that "Defense counsel in this case didn't brand the Government witnesses as liars because he wanted to, but because he had to . . . . He can't claim that it's a misidentification, he can't claim an alibi . . . . So what's he going to do?" App. 897-98. Moreover, to illustrate the robberies' effect on interstate commerce, the Government asked the jurors whether they would patronize a pharmacy that they knew had been robbed. When defense counsel objected to this line of argument, the District Court advised the jury to "take the instructions as to the law from the Court" and that "if there's ever any inconsistency between what you understand what [sic] counsel's saying with respect to principles of law, and the law as I give it to you, it's my instruction that controls." App. 921. The Court then went on to instruct the jury on the presumption of innocence and on the "minimal" effect on interstate commerce required to establish a jurisdictional nexus for a Hobbs Act violation.

The jury found Kale guilty of seven of the thirteen counts set forth in the superseding indictment. Kale moved for a new trial, claiming the District Court erred by

4

allowing a non-expert to testify about how cell phone towers operate. The District Court denied Kale's motion and, on June 8, 2010, imposed a total sentence of 384 months imprisonment, a five-year term of supervised release, a special assessment of $700, and restitution in the amount of $58,889.87. This timely appeal followed.[1]

## II

## A

Kale claims the District Court erred by allowing a lay witness—a custodian of records for Sprint—to testify about how cell phone radio waves reach cell towers. At trial, Jeff Strohm explained that a "cell phone is constantly searching for the strongest signal" and that the strongest signal is usually determined by "how far away you are from the cell phone tower." App. 781-82. When Kale's counsel objected, stating that this was expert testimony and that a proper foundation had not been laid, the Government explained that the witness "is not offered as an expert, because when you call a cell cite [sic] expert, they testify as to the particular site of the tower that it went off." App. 778. The Court then asked the witness whether he had learned this information "from [his] employer," and the witness responded that he had. App. 781-82. Finding that Strohm was qualified to testify about Kale's cell phone records, the District Court admitted this testimony over Kale's objection.

---

[1] The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction over Kale's appeal pursuant to 18 U.S.C. § 1291.

We review the District Court's evidentiary rulings, including whether opinions are admissible under Federal Rule of Evidence 701, for abuse of discretion. *Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 80 (3d Cir. 2009). Under Rule 701, a lay witness may only offer opinions on subjects "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." FED. R. EVID. 701(c). In other words, a person may testify as a lay witness only if his opinions or inferences do not require any specialized knowledge and could be reached by any ordinary person. *See* FED. R. EVID. 702; *see also* FED. R. EVID. 701 (advisory committee's note (2000 amend.)) ("[T]he distinction between lay and expert witness testimony is that lay testimony results from a process of reasoning familiar in everyday life, while expert testimony results from a process of reasoning which can be mastered only by specialists in the field.").

We agree with the District Court that Strohm's limited discussion of the operation of cell phone towers did not require any "scientific, technical, or other specialized knowledge." FED. R. EVID. 702. Strohm did not testify as to Kale's precise location when he called Buonanno; as the Government notes, such testimony would have required a technical background. Strohm's testimony, by contrast, consisted entirely of reading and interpreting Kale's cell phone records, including records detailing the locations of cell phone towers used to carry out his phone calls. A person of average intelligence would almost certainly understand that the strength of one's cell phone reception depends largely on one's proximity to a cell phone tower. Even if this were not common

6

knowledge, Strohm certainly had sufficient training and experience to testify about the operation of Sprint's cell phone towers. Strohm had worked for Sprint for over a year, was trained for four weeks on how to read cell phone records, and interacted regularly with radio frequency engineers. Thus, he had sufficient "personal knowledge" of how cell phone towers operate to testify reliably on this subject. *Donlin*, 581 F.3d at 81 ("When a lay witness has particularized knowledge by virtue of her experience, she may testify—even if the subject matter is specialized or technical—because the testimony is based upon a layperson's personal knowledge rather than on specialized knowledge within the scope of Rule 702.").

Moreover, even if the District Court's admission of Strohm's testimony had been erroneous, the error would be harmless. *Becker v. ARCO Chem. Co*., 207 F.3d 176, 205 (3d Cir. 2000). The phone records presented at trial confirmed that Kale sent text messages and called Buonanno several times on the days of the Davis and Haussemann robberies. These contacts are consistent with Buonanno's testimony that Kale offered to sell him Percocet that he had stolen from the pharmacies on those days. Similarly, Buonanno's statement that Kale arrived with his co-conspirators in a silver car is corroborated by testimony from Young and Conquest that they drove with Kale to New Jersey on November 11, 2008, and by testimony heard throughout the trial that Kale drove his girlfriend's silver Malibu as a getaway car in both robberies. Thus, we would uphold Kale's conviction even if the admission of Strohm's evidence were erroneous.

Because Strohm's testimony was not "scientific, technical, or specialized" in nature, and because this evidence was not prejudicial, we will not reverse Kale's conviction on this ground.

B

Kale also argues that the Government made several comments during its closing argument that warrant reversal of his conviction. First, he claims that the prosecutor's statement that he "didn't brand the Government witnesses as liars because he wanted to, but because he had to" improperly shifted the burden of proof to the defense in a criminal trial. App. 898. Because Kale objected to the Government's comments at trial, we review the district court's decision for abuse of discretion and, if error is found, apply harmless error analysis. *See United States v. Nelson*, 284 F.3d 472 (3d Cir. 2002); *United States v. Molina-Guevara*, 96 F.3d 698 (3d Cir. 1996).

We are not convinced that permitting the Government's comments constituted an abuse of discretion. Considered in context, these comments merely noted Kale's limited options for mounting a viable defense. Indeed, given Kale's close relationships with the Government witnesses, a defense strategy based on misidentification would have been implausible. The Government never claimed that Kale had the burden of producing any evidence, and in fact stated during summation that "[t]he Government . . . has the burden of going forward with the evidence at all times." App. 935. Thus, this comment alone does not require a reversal of Kale's conviction.

8

We are similarly unpersuaded by Kale's argument that a manifest injustice occurred when the Government explained that an average person would be less likely to patronize a pharmacy that had been robbed at gunpoint. Although Kale objected to this statement by the Government during its closing argument, he did so based on an alleged "misstat[ement of] . . . the law." App. 920-21. Because his basis for appeal, *i.e.*, that the prosecution "played on the fears of the jurors," is distinct from his objection at trial, we review the comment for plain error. *United States v. Olano*, 507 U.S. 725, 731 (1993). "In order to demonstrate prosecutorial misconduct under a plain error standard, the review must reveal 'egregious error or a manifest miscarriage of justice.'" *United States v. Brown*, 254 F.3d 454, 458 (3d Cir. 2001) (quoting *United States v. Price*, 76 F.3d 526, 530 (3d Cir. 1996)).

Under the Hobbs Act, the Government must show that a defendant's conduct "obstructed, delayed, or affected commerce in any way or degree." 18 U.S.C. § 1951; *United States v. Urban*, 404 F.3d 754, 762 (3d Cir. 2005) ("If the resources of a business are expended or diminished as a result of the payment of money, then interstate commerce is affected by such payment and may reduce the assets available for purchase of goods, services or other things originating in other states."). The District Court properly instructed the jury on the law, explaining that "conduct affects interstate commerce if it in any way interferes with, changes, or alters the movement or transportation or flow of goods, merchandise, money, or other property in commerce between or among the states."

9

App. 885-86.  The Court also instructed members of the jury to "consider [the evidence] in light of [their] everyday experience and events."  App. 968.

Here, the jury heard from several witnesses that the Davis and Haussemann Pharmacies sold numerous out-of-state items and spent considerable funds on increased security following the robberies.  The jury also heard that three squad cars arrived at the Haussemann Pharmacy following the robbery on November 18, 2008.  Based on this evidence, the Government asked the jury to consider how they would react under these circumstances:

> For example, if you go to your corner store in your corner pharmacy to get a prescription filled, and one day you see three squad cars outside with the lights going, and you find out that there was an armed robbery, and that there were guys in there with sawed-off shotguns and guns, aren't you going to think twice about getting in there and filling your prescription?"

App. 921.  Because the Government merely asked the jury to follow the Court's instruction and "consider [the evidence] in light of [their] everyday experience and events," we find that it did not "plainly" err in making this statement.

## III

For the foregoing reasons, we will affirm the District Court's judgment of conviction and affirm its denial of Kale's motion for new trial.