NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

12-135

STATE OF LOUISIANA

VERSUS

MARLON J. BANKS

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 13815-08
HONORABLE ROBERT L. WYATT, DISTRICT JUDGE

**********

PHYLLIS M. KEATY
JUDGE

**********

Court composed of Sylvia R. Cooks, Marc T. Amy, and Phyllis M. Keaty, Judges.

AFFIRMED; REMANDED WITH INSTRUCTIONS.

John F. DeRosier
District Attorney
Carla S. Sigler
Assistant District Attorney
901 Lakeshore Drive, Suite 600
Lake Charles, Louisiana 70602
(337) 437-3400
Counsel for Appellee:
        State of Louisiana

**Beth S. Fontenot**
**Louisiana Appellate Project**
**Post Office Box 3183**
**Lake Charles, Louisiana  70602**
**(337) 491-3864**
**Counsel for Defendant/Appellant:**
     **Marlon J. Banks**

**Marlon J. Banks**
**In Proper Person**
**E.H.C.C.**
**Post Office Box 174**
**St. Gabriel, Louisiana  70776**
**Defendant**

**KEATY, Judge.**

Defendant, Marlon J. Banks, was convicted by a jury of one count of armed robbery and one count of using a firearm in the commission of an armed robbery. He was sentenced to ten years at hard labor for the armed robbery and five years at hard labor for using a firearm in the commission of the armed robbery to be served consecutively. Defendant now appeals. For the following reasons, we affirm and remand with instructions.

## PROCEDURAL HISTORY

On June 30, 2008, Defendant was charged by bill of information with two counts of armed robbery in violation of La.R.S. 14:64 and one count of using a firearm in the commission of the armed robbery in violation of La.R.S. 14:64.3. The second count of armed robbery was dismissed before the matter proceeded to trial. After a two-day trial, a jury found Defendant guilty as charged. He was sentenced to ten years at hard labor without benefit of probation, parole, or suspension of sentence for the armed robbery and five years at hard labor without the benefit of probation, parole, or suspension of sentence for using a firearm in the commission of the armed robbery. The sentences were ordered to run consecutively.

Defendant now appeals. For the following reasons, we affirm Defendant's convictions and sentences; however, the trial court is ordered to inform Defendant of the delays for seeking post-conviction relief under La.Code Crim.P. art. 930.8.

## STATEMENT OF FACTS

Eyan Moses testified at trial that he and his sister, Brandi Leible, were robbed at gunpoint in a Chase Bank parking lot after leaving Crystal's Downtown, a nightclub in Lake Charles, Louisiana, after midnight on May 18, 2008. He had consumed one-half of a mixed drink. Eyan explained that he and Brandi were

standing outside his car while Brandi smoked a cigarette when two black men came up behind them. One put an automatic handgun to Brandi's side while the other put a gun to Eyan's stomach and pushed him against the car. The men demanded money and credit cards. Eyan pulled out his wallet, and the robbers took his debit card and driver's license. The men ordered the siblings into their car, threatening that they knew where to find the victims if either called the police.

According to Eyan, the man who had the gun on Brandi turned around and pointed the gun at him as they were driving out of the parking lot. Eyan then "floored it" and hit the man with his car. The man landed on the hood, denting it with his knees, and smashing into the windshield. He yelled at Eyan to "stop the f--king car" as Eyan sped toward the exit of the parking lot. Upon Brandi's advice, Eyan slammed on the brakes, and the man was flung off the car. He appeared to be limping on his right leg as he ran away.

After driving away from the scene, Eyan called the police. He and Brandi returned to the crime scene to meet with detectives. Eyan told them that both of the robbers appeared to be in their twenties. The one who pointed the gun at him was wearing a dark brown t-shirt and was about Eyan's height. The man who pointed the gun at Brandi was wearing jeans and a white t-shirt. He was taller than the other robber and had a long face and a big nose.

Eyan reported his debit card as stolen. He later learned that it had been used six times between 1:30 a.m. and 3:25 a.m. on May 18, 2008, at the Murphy USA gas station in front of the Wal-Mart on Highway 14. Several days after the robbery, Detective Richard Harrell with the Lake Charles Police Department (LCPD) showed Eyan a photographic line-up containing six pictures. Eyan selected the picture of the fourth man in the line-up as the person whom he believed held the automatic gun to his sister. He signed a form circling number "4" and indicating

2

that he chose that subject saying, "That looks like the dude I hit with my car." At trial, Eyan identified Defendant as the man who robbed him and his sister and whom he hit with his car. He explained that any uncertainty that he had about Defendant being the robber was because Defendant's hair was different and he appeared to have gained weight since the robbery. Eyan reiterated that the robbery took place right under the parking lot lamp and that when the man was on his hood, he got a close-up view of the perpetrator. Eyan stated that the gun which was accepted into evidence as State's Exhibit Number 16 looked like the gun that Defendant used in the robbery.

Brandi's testimony about the chain of events and the threats made by the robbers was similar to that of her brother. She stated that one of the men put a silver gun without a cylinder to her side while the other put a revolver to Eyan's stomach and pressed him against the car. She confirmed that the man who Eyan struck with his car was wearing a white shirt and blue jeans and that he had a gun without a cylinder. Brandi testified that she drank two mixed drinks at Crystal's.

Corporal Chad Edwards with the LCPD testified that he was on duty during the early morning hours of May 18, 2008, and responded to a dispatch concerning an armed robbery. He took a report from the two victims and then turned the matter over to Detective Kim Almerol who had also responded to the call. Upon inspecting the victims' car, Corporal Edwards noticed a dent to the hood that was several inches in length and damage to the roof just above the windshield. He and Detective Almerol checked the vehicle for fingerprints, but they did not find any.

Detective Almerol testified that she took statements from the victims at the scene and then referred the case to the violent crimes division. She stated that none of the bar's patrons came forward and identified themselves as witnesses. Detective Almerol's account of what the victims told her at the scene essentially

mirrored that of what they testified to at trial and that which they had told Corporal Edwards. Neither Corporal Edwards nor Detective Almerol believed that the victims were intoxicated.

Detective Harrell, who worked in the LCPD's violent crimes unit, testified that he was assigned to the case the day after the crime occurred. He obtained a report from Eyan's bank showing the locations where someone had attempted to use his stolen debit card. All of the addresses were near the intersection of Prien Lake Road and Highway 14. Detective Harrell obtained video from the Murphy USA gas station taken when Eyan's debit card was used twice within a minute.[1] It showed two black males in a Ford truck. One was wearing a white shirt and was tall. The video was not clear enough to depict facial features of either male.

Detective Harrell testified that he issued a media release on KPLC television station relating the basics of the crime and notifying the public that one of the assailants had injured his leg during the robbery and may have sought medical attention. The next day, Detective Harrell received an anonymous tip that Marlon James Banks went to Moss Regional Hospital complaining of a swollen, injured knee. After collecting information about Defendant's hospital visit, Detective Harrell had a photographic line-up produced containing Defendant's picture. When Detective Harrell showed Eyan the line-up, he almost immediately identified Defendant as the robber and the man he hit with his car.

Detective Harrell explained that he then obtained an arrest warrant for Defendant. Because Defendant was working offshore at the time, Detective Harrell arranged to have Defendant flown back to Lafourche Parish to be arrested. Once there, Detective Harrell read Defendant his rights pursuant to *Miranda v.*

---

[1] The State called Sergeant David Streva to testify about collecting the surveillance video from Murphy USA gas station.

4

*Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966). Defendant indicated that he understood his rights and did not ask for an attorney. Defendant was interviewed at 1:50 a.m. on May 24, 2008.

During the interview, Defendant stated that he worked as a sandblaster on an oil rig three weeks out of every month. Defendant told Detective Harrell that his knee was sore because he re-injured it at work. He confirmed that he was in Lake Charles from the Wednesday prior to the robbery until the Tuesday or Wednesday thereafter. Defendant said he stayed at his cousin Ezora Banks' house in the 600 block of Dixie Drive on Saturday and Sunday nights. Defendant stated that he got to his cousin's house at 6:00 p.m. on Saturday and remained there until noon on Sunday. He claimed to have attended a child's birthday party Sunday evening at Chuck E. Cheese with his family, his girlfriend, and the mother of his children. Defendant explained that his sister, Nichelle Banks, picked him up on Monday and drove him to Moss Regional Hospital. Defendant agreed to release his medical records to Detective Harrell. Defendant told Detective Harrell that he had worn a gray shirt and blue jeans the entire weekend. Defendant adamantly maintained that he had not robbed anyone.

Defendant gave his cell phone number to Detective Harrell. He claimed that he did not make or receive any phone calls while at his cousin's house. Detective Harrell subpoenaed Defendant's Centennial Wireless phone records and requested a cell tower report showing which towers Defendant's calls used for the days around the robbery. The cell tower report indicated that Defendant had calls that bounced off five different towers in north Lake Charles during the time of the robbery. The records showed that Defendant made sixty-nine calls during the time he claimed to have been at his cousin's residence. They further showed that

Defendant changed his phone number the day after the robbery but kept the same phone.

The robbery occurred around 1:15 a.m. Detective Harrell stated that within minutes of the robbery, Defendant had two calls that bounced off the tower atop the Hibernia building, which was on the same block as and within 400 to 500 feet of the robbery. The first call was made at 12:14 a.m. and began at the Cookie Lane tower on Opelousas Street and ended at the Hibernia tower. The second call was at 12:25 a.m., and it both began and ended at the Hibernia tower. In Detective Harrell's opinion, this information showed that Defendant was traveling from the Opelousas Street/Cookie Lane tower area to the Hibernia tower area which disproved Defendant's claims that he never left his cousin's house and neither made nor received any phone calls during that time.

Detective Harrell obtained recordings of the phone calls Defendant made in jail. Defendant made calls to his girlfriend and his mother, Cassandra Levins. Defendant repeatedly asked Mrs. Levins if she had gotten "that object" out of the house and told her to get it out before the police went to her house. Defendant then informed her of where the object was located, but, according to Detective Harrell, that part of the recording was unclear.

Detective Harrell contacted Mrs. Levins and told her that the conversations between her and her son had been recorded. After being *Mirandized*, Mrs. Levins agreed to be interviewed. She stated that Defendant was referring to a handgun he owned that was stored in her attic. Mrs. Levins consented to have her home searched. Later, Detective Harrell, along with another detective went to Mrs. Levins' house, photographed the house and the location of the handgun, and retrieved and processed the handgun, a silver and black Brico .380 semi-automatic.

According to Detective Harrell, the weapon was consistent with the description of one of the handguns used in the robbery.

Mrs. Levins testified at trial that she thought Defendant told her to get rid of the gun in the attic so she would not be evicted because there were signs barring weapons and drugs in the projects where she lived. She stated that Defendant had given her the gun for protection years earlier because she lived alone. Nevertheless, she admitted that she did not like guns and that she did not like to touch guns or bullets. On cross-examination, Mrs. Levins stated that she did not see Defendant get the gun and she did not think he had a key to her house or could have accessed the gun without her knowledge. Mrs. Levins explained that Defendant injured his knee when he was nineteen; at the time of the trial, Defendant was twenty-seven. She said that it was not unusual for Defendant to complain about his leg injury, and he had gone to the doctor for the complaint on more than one occasion.

Detective Harrell interviewed Defendant's cousin, Ezora Banks, who lived at the Dixie Drive address where Defendant claimed to be at the time of the robbery. Ms. Banks stated that Defendant stayed with her Friday night through Sunday night. However, Ms. Banks worked a graveyard shift from 7:00 p.m. until the morning, so she was not present at all times Defendant claimed to be there. She said that her Aunt Vickie babysat her kids the weekend of the robbery. Ms. Banks said the Chuck E. Cheese party occurred on Friday instead of Sunday. She stated that Defendant wore a white t-shirt and blue jeans all weekend. Ms. Banks told Detective Harrell that she did not trust Defendant and was hesitant about allowing him to stay in her home.

7

At trial, Ms. Banks stated that she paid Defendant $20.00 per night to babysit her four children on the weekend in question.[2] Ms. Banks said her oldest daughter would have told her if Defendant had left the house. She stated that when she arrived home every morning during that time, Defendant was asleep on her sofa. Ms. Banks said that she did not hear Defendant complain about his knee until Sunday, which was the day after the robbery.

Dr. Jeffrey Combetta treated Defendant at Moss Regional Hospital on May 19, 2008. Defendant's complaint was of right knee swelling. Defendant told Dr. Combetta he had bullet fragments in his knee from a prior gunshot wound from several years earlier and that the pain had flared up while he was working offshore. Dr. Combetta did not recall any abrasions on the outside of the skin. He ordered an X-ray to make sure the bullet had not shifted. The X-ray did not reveal any internal bleeding or other indications that the bullet had moved. Dr. Combetta observed minimal soft-tissue swelling but nothing that would have indicated a more serious problem. He determined that it was unlikely that the problem was caused by an aggravation of the old wound. Since the swelling had not been caused by the bullet or fragment shifting, Dr. Combetta opined that it must have been caused by the knee being hit or by Defendant falling on his knee.

Defendant's sister, Nichelle Banks, remembered the weekend that Defendant was accused of committing armed robbery. Defendant had arrived home from being offshore on a Thursday and was complaining about his knee. Nichelle's grandmother had called and asked her to take Defendant to the hospital so she picked him up from Ezora Banks' house on Monday and brought him to the emergency room. Defendant's knee was puffy and looked like it had fluid in it.

---

[2] She thought Defendant babysat May 16 through 18, 2008, but it could have been May 15 through 17, 2008, or May 14 through 16, 2008.

Nichelle explained that Defendant had been shot in the knee eight or nine years before trial. Upon questioning by the defense, Nichelle said that it was Defendant who asked her to take him to the emergency room that Monday. She also said that although Defendant occasionally had problems with his knee, she had never before brought him to the doctor for it. Later, when questioned by the State, Nichelle testified that she had taken Defendant to an out-of-state doctor for his knee about a month before the robbery. She said that Defendant sometimes gave her money to help out with her kids, and he had given her $60 when he came into town on the Thursday before the robberies.

Michaelle Nero, the Regional Operations Manager for Centennial Wireless, identified State's Exhibit Number 10 as a report generated for Marlon J. Banks from May 17 through 19, 2008. It showed that Defendant changed his cell phone number on May 19, 2008. Ms. Nero explained that cell phones always grab the signal from the closest tower, and if a caller is moving and the signal is getting weak, the call will switch to the tower with the strongest strength. The report showed two outgoing calls from Defendant's former cell phone number that began and ended on the Hibernia cell tower around 12:14 a.m. on May 18, 2008.

## DISCUSSION

### *Errors Patent*

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we have found one error patent.

The record does not indicate that the trial court advised Defendant of the prescriptive period for filing post-conviction relief as required by La.Code Crim.P. art. 930.8. Accordingly, the trial court is directed to inform Defendant of the provisions of Article 930.8 by sending appropriate written notice to Defendant

within ten days of the rendition of this opinion and to file written proof in the record that Defendant received the notice. *See State v. Roe*, 05-116 (La.App. 3 Cir. 6/1/05), 903 So.2d 1265, *writ denied*, 05-1762 (La. 2/10/06), 924 So.2d 163.

*Assignment of Error No. 1*

Defendant argues that because of the uncertain identification of him as one of the perpetrators and the unconvincing corroboration evidence, the State failed to negate any reasonable probability of misidentification. As a result, he contends that the evidence was not sufficient to convict him of armed robbery and armed robbery with a firearm. Defendant asserts that when identity is an issue at trial, the State must negate any reasonable probability of misidentification before it can meet its burden of proof; therefore, as Defendant denied participating in the armed robbery, identity was a key issue. Defendant acknowledges that the testimony of an eyewitness alone can be enough to meet the State's burden; however, he contends that the jury seemed to be having trouble believing that the identification made at trial was reliable because the jury twice declared that it was having trouble reaching a verdict in Defendant's case. Defendant continues that the other evidence presented by the State failed to convincingly corroborate the witness's identification and that he had an alibi for the time of the robbery.

Defendant urges that Eyan's identification was not credible for a multitude of reasons: the robbery took place in a parking lot after midnight; the victims had been drinking; the perpetrators had pressed guns into the victims' sides; both victims stated that the encounter was very brief; the victims' initial descriptions given to the police only included race, gender, an age estimation, and a general height estimation by shirt color; Eyan was in shock during the encounter; the photographic line-up did not take place until five days after the robbery; Eyan's identification was cross-racial; and Brandi could not identify anyone in the

10

courtroom as one of the robbers. Defendant posits that Eyan's close-up view of the perpetrator he hit with his car was unreliable because, afterward, he could only say that the one he hit had a longer face and a big nose. Defendant points out that Eyan admitted at trial that the statements he made during the line-up did not sound like he made a positive identification and that, in court, Eyan was only ninety-five percent sure that the person he hit with his car was Defendant.

Defendant advances that the evidence presented by the defense also discredited Eyan's identification. At trial, Defendant and his family members explained that his hospital visit for knee pain was the result of an ongoing knee problem created when he shot himself there several years before and the pain Defendant had been experiencing at the time had preceded the robbery by a few days. Defendant's knee injury was confirmed by an X-ray and medical examination. The doctor's examination showed that Defendant had soft-tissue swelling but no internal bleeding, shifting of the bullet, or surface tears or abrasions. The doctor did not testify that Defendant's knee injury was consistent with being hit by a car. Moreover, Defendant was able to return to work and perform his duties until his arrest.

Defendant contends that the cell phone records submitted into evidence by the State do not prove he was at the robbery scene. He points out that his phone number changed the day after the robbery. Defendant maintained that the information derived from the cell towers supported his claim that he had not used the cell phone near Ezora Banks' house. Moreover, he claims that the State failed to present evidence regarding the range of the cell towers, the area they covered, and which cell tower covered his aunt's Dixie Drive address.

Defendant further argues that the physical evidence did not link him to the crime. Defendant points out that his fingerprints were not found on the gun

11

retrieved from his mother's attic. He submits that although the victims thought the gun looked like the one used in the robbery, the type of weapon was common and neither victim could positively identify the seized gun as the one used in the robbery. Defendant points out that neither Eyan's driver's license nor his debit card were ever found or linked to him. Moreover, the video of the perpetrators using the stolen debit card was not clear enough to identify Defendant as one of the perpetrators. Based on these arguments, Defendant posits that the State failed to meet its burden of proving that he was one of the armed robbers.

The State responds that it proved Defendant's identity as the perpetrator beyond all reasonable doubt. It further contends that it presented ample evidence to support Defendant's convictions of armed robbery and armed robbery with a firearm.

The Louisiana Supreme Court has discussed the standard of review for evaluating the sufficiency of the evidence on appeal:

> The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). A determination of the weight of evidence is a question of fact, resting solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. A reviewing court may impinge on the factfinding function of the jury only to the extent necessary to assure the *Jackson* standard of review. It is not the function of an appellate court to assess credibility or re-weigh the evidence.

*State v. Macon*, 06-481, pp. 7-8 (La. 6/1/07), 957 So.2d 1280, 1285-86 (citations omitted).

> In cases where the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the state is required to negate any reasonable probability of misidentification. A positive identification by only one witness is sufficient to support a conviction. A victim's or witness's testimony alone is usually sufficient to support the verdict, as appellate courts will not second-

12

guess the credibility determinations of the fact finder beyond the constitutional standard of sufficiency. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the fact finder, is sufficient support for a requisite factual conclusion.

*State v. Dorsey*, 10-216, pp. 43-44 (La. 9/7/11), 74 So.3d 603, 633-34, *cert. denied*, ___ U.S. ___, 132 S.Ct. 1859 (2012) (citations omitted).

The evidence most favorable to the prosecution shows that Eyan was able to positively identify Defendant as the robber he hit with his car. Eyan made both a photographic line-up identification as well as an in-court identification, and he said that any slight uncertainty on his part was because Defendant was wearing different clothes, was heavier, and had a different hair style than the evening of the robbery. Contrary to the defense's contention that Eyan could not have accurately remembered his assailant because it was dark and because he had been drinking, the evidence at trial showed that Eyan had consumed one-half of an alcoholic beverage and that he and his sister were in the well-lit area of the parking lot when the robbery occurred. Moreover, Eyan had a clear view of the perpetrator's face when the man was on the hood of Eyan's car.

A prior statement by Ezora Banks confirmed that Defendant had been wearing the white shirt and blue jeans or blue jean shorts the victims described the assailant as wearing. Phone records showed that, despite his protestations that he was on another side of town, Defendant was in the vicinity of the robbery around the time of the robbery. Moreover, Defendant sought medical treatment shortly after the date of the robbery for an injury consistent with that sustained by the assailant being hit by Eyan's car. To further add to Eyan's credibility, Defendant displayed anxiety about the possibility the police would recover a handgun he kept at his mother's house, and the firearm retrieved from Mrs. Levins' home was

13

consistent with that described by the victims as being used by the perpetrator matching Defendant's description.

Though the defense presented evidence to show that Defendant was limping before the robbery, the jury clearly believed Eyan's identification. There was no apparent reason for Eyan to wrongfully accuse Defendant of being one the robbers, and the inconsistent nature of the testimony given by the witnesses sympathetic to Defendant clearly cast doubt on the veracity of their in-court statements.

Ezora Banks, Defendant's cousin, changed her original statements to Detective Harrell to insist that Defendant stayed with her to babysit her children when, prior to trial, she said that her aunt watched her children that weekend. At trial, Ms. Banks made a point of saying that she paid Defendant $20 to stay with her children that weekend. Mrs. Levins insisted that she kept the unloaded gun retrieved by law enforcement for her protection, yet she also maintained that she had never and would never touch a gun or bullets. Defendant's sister also gave inconsistent testimony. On the first day of trial, Nichelle Banks said that her grandmother asked her to take Defendant to the hospital and that she had never taken Defendant to the doctor for his knee before. However, on the second day of trial, Nichelle stated that it was Defendant who asked her to take him to the emergency room and that she had previously taken Defendant to an out-of-state doctor for his knee.

Also noteworthy, Defendant changed his cell phone number after the offense. The jury could have inferred from this that Defendant was attempting to avoid being placed in the area through mobile phone data.

Though the defense contends that Eyan's identification was inherently invalid because it was cross-racial, the victims' race is not in the record. The jury had the opportunity to evaluate the relative races of the victims in comparison to

Defendant and apparently decided that it did not create a bar to accurate identification.

In light of the evidence most favorable to the prosecution, a rational trier of fact could have found that Eyan's identification of Defendant as one of his assailants was credible. Eyan's testimony was not marred by internal contradiction or irreconcilable conflict with physical evidence. Accordingly, this assignment of error is without merit.

### *Assignment of Error No. 2*

Defendant asserts that the trial court "erroneously allowed a police officer to render an expert opinion as to Mr. Banks' location near the time of the robbery by using cell phone towers to track Mr. Banks' location." Defendant maintains that the Centennial expert should have been the only witness allowed to testify concerning how cell phone signals travel to the nearest tower.

Defendant points out that the Centennial expert could not answer a question regarding the relative strength of the Hibernia Tower in comparison to the Cookie Lane Tower; she stated that the "A.V.P." of cell sites would have to answer that question. Ms. Nero was only familiar with the billing division of Centennial, so she could not answer technical questions concerning the function and coverage of the cell towers, and the State offered no other experts from Centennial.

Defendant urges this court to find that Detective Harrell was erroneously allowed to offer expert testimony regarding his location as indicated by his cell phone records. Defendant contends that this was very prejudicial to his case as it discredited his testimony and lent credit to Eyan's uncertain identification. Defendant asserts, therefore, that his convictions and sentences should be reversed and the matter remanded for a new trial.

15

The State responds that Detective Harrell testified about the false statements Defendant made to him. While Defendant told Detective Harrell that he neither made nor received phone calls during the weekend, the phone records showed that Defendant made sixty-nine calls. Defendant changed his cell phone number the day after the robbery, and his phone records showed that his phone was in the vicinity of the robbery at the time of the crime. Moreover, the State submits that Ms. Nero's testimony corroborated Detective Harrell's account of the methodology used to track location through cell phone signals.

The State maintains that it did not offer Detective Harrell as an expert, and it was not required to offer him as such. Detective Harrell's testimony was used to explain the course of the investigation and to point out Defendant's lies to law enforcement. The State contends that Detective Harrell, as a lay witness, was allowed to express opinions or inferences that were relevant and rationally based on his perception because there was no particular expertise needed to interpret the cell phone records in order to disprove Defendant's statements. Furthermore, a law officer is permitted to testify on matters without being qualified as an expert when he gained the personal knowledge through experience. Alternatively, the State asserts that any error was harmless.

The defense objected once during Detective Harrell's testimony concerning the cell tower reports, arguing that the Centennial expert would be the person to testify about cell phones. The State responded that the purpose of the line of questioning was to show what significance the cell phone report was to Detective Harrell when he reviewed it. The trial court overruled the exception, and Detective Harrell testified as follows:

> When you make or receive a phone call, it is my understanding that the signal travels to the nearest cell tower that's -- you have your company with. And the phone records showed that -- I think it's five

-- just from the timeframe [sic] that I asked him from, from the time that he said that he was at Ezora's -- Ezora Banks' residence, to the time he left her residence at noon the next day -- he said he never left.

I believe there's five different towers he bounced off of, all in north Lake Charles, which is nowhere near Dixie Drive where he claimed to be. And more specifically, one or two calls were made within minutes of the actual robbery, and bounced off of the tower that was placed on top of Hibernia Bank . . . .

Because the defense did not mention making the objection continuing, and because no objections were made in the remaining transcript pages referred to by Defendant's appellate brief, we will only examine the admissibility of any of the evidence contained in the quotation. *See* La.Code Crim.P. art. 841.

Under La.Code Evid. art. 701, lay witnesses are allowed to offer opinion and inference testimony:

If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are:

(1) Rationally based on the perception of the witness; and

(2) Helpful to a clear understanding of his testimony or the determination of a fact in issue.

However, only experts are allowed to give opinion testimony in areas of specialized knowledge: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." La.Code Evid. art. 702.

Though Louisiana courts have not discussed this issue, the federal third and eleventh circuits, in unpublished cases, have addressed this issue and have determined it is acceptable for a lay witness to testify that cell signals usually are accepted by the nearest tower. They have determined that the same lay witness can

tell the jury what cell tower accepted the mobile phone signals at specific times based on that witness's examination of historical cell phone records. *See U.S. v. Kale*, 445 Fed.Appx. 482, 485 (3rd. Cir. 2011) (unpublished); *U.S. v. Rodriguez*, 452 Fed.Appx. 883, 888 (11th Cir. 2012) (unpublished); and *U.S. v. Feliciano*, 300 Fed.Appx. 795, 800-01 (11th Cir. 2008) (unpublished), *cert. denied*, ___ U.S. ___, 129 S.Ct. 2174 (2009). *See also*, *U.S. v. Henderson*, (unpublished) (N.D. Okla. 2011).[3]

Finding the reasoning expressed in the federal cases persuasive, we conclude that the trial court did not err in overruling Defendant's objection. Defendant's objection was that only an expert could explain the significance of data contained in cell phone records. However, we conclude that Detective Harrell's explanation that cell signals are captured by the nearest tower and that the data in the cellular records showed that Defendant was not where he claimed to be was admissible lay person testimony.

Accordingly, this assignment of error is without merit.

*Assignment of Error No. 3*

In his third assignment of error, Defendant alternatively argues that "in light of the uncertain identification of Mr. Banks, the unconvincing corroborating evidence, the erroneously admitted expert testimony regarding cell phone tracking[,] and the jury's expressed desire to be declared a hung jury, this Honorable Court should reverse and remand the case for a new trial."[4] Defendant

---

[3] 2011 WL 6016477.

[4] In his original appellant brief, counsel for Defendant reserved the right to file an assignment of error regarding the trial court's instructions in response to the jury's questions regarding a hung jury. In its appellee brief, the State reserved its right to respond to any supplemental brief asserting a new assignment of error. By letter dated March 29, 2012, counsel for Defendant stated that she would not be filing any additional briefs. Thereafter, this court received a similar advisement from the State.

asserts that the trial should have ended in a hung jury because the case against him was weak and because Detective Harrell should not have been allowed to testify about how Defendant was tracked through his cell phone records. Defendant cites no legal principles to support his claim that a hung jury should have been granted.

The State points out that the defense has failed to provide any legal basis for this assignment of error and that Defendant, instead, reasserts the first two assignments of error under this complaint as a type of cumulative error argument.

Examination of the transcript of the proceedings reveals the jury first inquired about a hung jury while they were still discussing the evidence. The trial court sent a note back to the jury telling them to continue their deliberations. The second exchange concerning the hung jury reveals that there was only one particular juror who was interested in the possibility of declaring a hung jury after deliberating for less than two hours. The trial court called the entire jury into the courtroom and explained that while it recognized that there was a lot of evidence for them to review, the task before them was a serious matter, and they needed to try to return a verdict. There was no contemporaneous objection lodged to the trial court's decision at either point. Therefore, this assignment of error is barred from review on appeal. *See* La.Code Crim.P. art. 841.

Next, the record shows that the second inquiry came after very little time had lapsed since the jury had first entered deliberations; at the time of the second inquiry, only two hours had passed. Moreover, the question was clearly not a request to declare a hung jury. The jury foreperson stated that all but one of the jurors were actively participating in the deliberations, and only one juror was interested in the possibility of declaring a hung jury. Thus, the trial court did not err in telling the jurors to continue with their deliberations.

Finally, cumulative error does not apply in the instant case insofar as it pertains to the assigned errors. As previously discussed, Defendant's other assigned errors are without merit; therefore, there has been no cumulative error to consider.

Accordingly, this assignment of error is without merit.

## DECREE

Defendant's convictions and sentences are affirmed. This matter is remanded, and the trial court is directed to inform Defendant of the provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to Defendant within ten days of the rendition of this opinion and to file written proof in the record that Defendant received the notice.

**AFFIRMED; REMANDED WITH INSTRUCTIONS.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2–16.3.