Rockingham
No. 2001-076

THE STATE OF NEW HAMPSHIRE

v.

GREGORY BLACKSTOCK

Argued: March 6, 2002
Opinion Issued: June 24, 2002

*Philip T. McLaughlin*, attorney general (*Laura E. B. Lombardi*, attorney, on the brief and orally), for the State.

*Paul J. Garrity*, of Londonderry, by brief and orally, for the defendant.

DUGGAN, J. The defendant, Gregory Blackstock, was convicted by a jury of aggravated felonious sexual assault. *See* RSA 632-A:2, II (1996) (amended 1999). His conviction was based upon allegations that between April 1, 1999, and July 1, 1999, he touched the genitalia of C.B., a minor female under the age of thirteen. The defendant contends that the Trial Court (*Abramson*, J.) erred by: (1) denying his motion to dismiss on the basis that the State presented insufficient evidence to prove that he touched the minor's genitalia; (2) ruling that if he cross-examined C.B.'s aunt about her bias against him, the State would be allowed to show that her bias was based upon other uncharged acts of sexual abuse by the defendant; (3) refusing to give an instruction on accident; and (4) refusing to reinstruct the jury on reasonable doubt as part of its final jury instructions. We affirm.

The following facts were established at trial. During the spring of 1999, the defendant worked for C.B.'s uncle and lived at C.B.'s aunt and uncle's

house during the week. While the defendant was repairing a camper, C.B. approached him and asked if she could help. The defendant assisted her inside the camper and at some point began tickling her. C.B. testified that the defendant's hand went under her clothes and he touched her twice "[b]etween [her] legs." After the defendant touched her, C.B. said that she heard her mother calling and she left the camper. C.B. later told her mother about the incident.

In July 1999, the police spoke with the defendant. The defendant claimed that he did not remember being alone with C.B. and that he had never touched her. In September 1999, the defendant had a conversation with C.B.'s aunt and unexpectedly began talking about C.B.'s allegations. He said he remembered the incident and recounted some of the details. He explained that he was working in the camper under the sink, that C.B. was standing in front of the sink, that his hands were cold so he put his hand on C.B.'s belly and, because she was wearing baggy pants, his hand might have slipped under her pants. C.B.'s aunt did not tell the police about this statement until a year later, in September 2000.

We first address whether there was sufficient evidence, based on C.B.'s testimony, to prove that the defendant touched her genitalia. The defendant moved to dismiss at the end of the State's case on the grounds that no reasonable jury could have found beyond a reasonable doubt that the defendant touched C.B.'s genitalia. The trial court denied the motion. On appeal, the defendant contends that C.B.'s testimony that he touched her "between [her] legs" and that he touched her in her "private parts" and "private area" is insufficient to establish that the defendant touched her genitalia as charged.

To prevail on appeal, the defendant must demonstrate that, viewing the evidence in the light most favorable to the State, no rational trier of fact could have found guilt beyond a reasonable doubt. *See State v. Graham*, 142 N.H. 357, 360 (1997). In the present case, C.B. testified as to the assault and so long as her testimony suffices to establish a *prima facie* case, no corroborating evidence is needed. *Id.*

During the trial, C.B. testified as follows:

Q. Where did he touch you, exactly?

A. Between my legs.

Q. In your private parts?

A. Yeah.

. . . .

Q. You said he did it twice, but I just want to be clear, did his hand actually leave your pants and then go back under your pants? Or just his hand was in your pants and he touched your privates, and then wasn't touching your privates, and then touched your privates again?

A. Mmm, yeah, the first one – second one.

Q. Well, did – did his hand actually leave your pants?

A. No.

Q. Okay. But you felt him actually touch between your legs in your private area –

A. Yeah.

The defendant argues that because the State failed to clarify what C.B. meant when she testified about being touched "between my legs" and what C.B. understood to be her "private parts" or "private area," the jury was left to speculate as to whether C.B. was referring to her genitalia.

The defendant compares this case to *State v. O'Neill*, 134 N.H. 182 (1991), in which we held that a minor's testimony that the defendant "stuck his fingers in my bum," combined with the minor pointing "to the area of his buttocks," was insufficient to prove penetration. *Id.* at 183, 187-88. After noting that the dictionary definition of the term "bum" includes "buttocks," we held that the testimony was too speculative to establish beyond a reasonable doubt that there was penetration of the minor's anus. *Id.* at 187-88.

In contrast, the State argues that this case is more similar to *Graham* than it is to *O'Neill*. In *Graham*, we found that sufficient evidence existed for the jury to find that the defendant touched the minor's vagina where: (1) the minor used the word "privates" to describe what the defendant touched; and (2) when asked to show on a stuffed bunny what she meant by "privates," she pointed between the bunny's legs. *See Graham*, 142 N.H. at 360-61. In *Graham*, we also noted that the dictionary definition of the word "privates" specifically includes "genitalia." *Id.*

■ While the absence of demonstrative evidence makes this a closer case than *Graham*, we believe the standard of appellate review requires us to agree that the evidence was sufficient in this case. As in *Graham*, the victim used the term "private parts" and identified the location of those parts as between her legs. Viewing this testimony and all reasonable inferences drawn therefore in the light most favorable to the State, we hold that the jury could have found beyond a reasonable doubt that the

defendant touched the victim on her genitalia as charged in the indictment. *See id.* at 361.

The defendant next argues that the trial court erred in its ruling on the defendant's pretrial motion *in limine.* The defendant's motion asked the court to preclude the State and its witnesses from referring to, during the course of the trial, "[a]ny and all reasons *why* [C.B.'s aunt] is upset with the accused while permitting inquiry by the accused that [C.B.'s aunt] is in fact upset with the accused." (Emphasis added.)

The facts underlying the motion are that, as noted above, in September 1999, the defendant admitted to C.B.'s aunt that he had touched C.B., although he claimed it was unintentional. The defendant later confessed "to his ... elders at the ... Jehovah's Witness [*sic*] church" that he had also acted improperly with the aunt's two children. C.B.'s aunt knew of the defendant's confession regarding her children and had discussed the matter with the police. However, she did not tell the police about the defendant's confession regarding C.B. until September 2000.

In an effort to bring out the aunt's bias against the defendant (stemming from his confession that he had improperly touched her children) and to avoid addressing these other alleged incidents of child abuse, defense counsel suggested to the trial court that the defense be allowed to ask C.B.'s aunt whether she was upset with the defendant and the prosecution be allowed to elicit that "she had in her mind a solid reason for thinking Mr. Blackstock did something bad to her family ... and leave it at that."

The trial court ruled that the defendant could address the fact that there had been a delay in reporting the September 1999 statement without opening the door to the other allegations, but that if the defense asked C.B.'s aunt whether she was upset with the defendant, the prosecution could ask *why* she was upset. In support of this ruling, the trial court explained that by not giving the State the opportunity to explain the reasons behind the aunt's bias, the jury would be left to speculate. The court explained: "They are left to speculate .... Is this a jilted girlfriend? Is this an unhappy employer? Is this someone from whom the defendant stole money?" Thus, the trial court ruled that the State would be allowed to make a limited inquiry into the reasons for C.B.'s aunt's bias "because of the issue of fairness and the issue of jury confusion, the problem of the jury not being able to evaluate her credibility in light of the bias and being left to speculate, and the problem of the State being unable to rebut any improper inference ...."

On appeal, the defendant argues that the court's ruling effectively limited his constitutional right to confront an adverse witness regarding her potential bias because it "forced the defendant into the intolerable position of having evidence of other acts of alleged sexual abuse exposed to

the jury if he chose to cross-examine [C.B.'s aunt] for bias." The State contends that because the defendant never opened the door to the allegedly prejudicial evidence by offering any bias evidence at trial, the defendant may not challenge the trial court's ruling on appeal.

We first address whether the defendant is precluded from challenging the court's ruling. We have held on several occasions that when a defendant refuses to testify after a trial court refuses to exclude certain evidence that may be used for impeachment purposes, the defendant forfeits his right to challenge the trial court's ruling on appeal. *See State v. Atkins*, 145 N.H. 256, 257-58 (2000); *State v. Bruneau*, 131 N.H. 104, 115 (1988); *State v. LaRose*, 127 N.H. 146, 150 (1985); *see also Luce v. U.S.*, 469 U.S. 38, 41-43 (1984). This rule is based on the premise that an appellate court has no way of knowing whether the defendant's decision not to testify was motivated purely by the trial court's adverse ruling, whether the testimony presented would have required impeachment by the State, and how the trial court ultimately would have ruled after weighing the probative value and prejudicial effects of the evidence in the specific factual context of a trial as it has unfolded. *See Bruneau*, 131 N.H. at 115; *Luce*, 469 U.S. at 43 (Brennan, J. concurring). Thus, when the record is devoid of any basis to infer that the defendant was prejudiced by the trial court's rulings, a motion *in limine* ruling will be inadequate to present an issue on appeal. *Bruneau*, 131 N.H. at 115.

We disagree, however, that in this case the trial court's *in limine* ruling is inadequate to preserve the issue for appeal. Here, the defendant sought an *in limine* ruling to determine whether, if he pursued a particular line of questioning, the State would be permitted to introduce otherwise inadmissible evidence. This case is similar to *State v. Benoit*, in which the defendant asked the court for a ruling, in the nature of a motion *in limine*, that, if he questioned the victim regarding her inability to identify him on the day of the robbery, he would open the door for inquiry by the State into a line-up identification which had been suppressed. *See State v. Benoit*, 126 N.H. 6, 20 (1985). In *Benoit*, the trial court ruled that "if you inquire into one specific area, the matter is then opened up and it would be unfair to preclude the State on redirect examination from inquiring into other identifications." *Id.* The defense counsel excepted to the court's ruling and chose not to question the victim about the misidentification. *See id.* On appeal, we reversed, concluding that the court erred in its ruling that the defendant would open the door if he questioned the victim as to her misidentification. *See id.* at 21. Because the defense counsel made an offer of proof as to what he sought to inquire into during cross-examination, we were able to determine from the record whether the

defendant was prejudiced by his inability to impeach the victim's credibility. *See id.*

■ Similarly, in this case the defendant supported his motion *in limine* with an explanation of the line of questioning he sought to pursue during cross-examination. During the trial, the defendant renewed his request and the trial court had an opportunity to consider its ruling in light of the testimony presented by the State. Because the record provides a sufficient basis for us to determine whether the trial court's ruling is sustainable, we hold that the defendant is not precluded from challenging the trial court's ruling on appeal.

We now turn to the merits of the defendant's argument. A defendant has a constitutional right to expose the bias of an adverse witness through cross-examination. *State v. Allison*, 134 N.H. 550, 558 (1991). Here, the defendant was not precluded from inquiring into the witness's bias. The defendant was informed, however, that any such inquiry would open the door to a limited inquiry by the State to allow C.B.'s aunt to explain her bias. While "the fact that the door has been opened does not, by itself, permit all evidence to pass through," *Benoit*, 126 N.H. at 21, it is also true that "[w]hen a defendant leaves the trier of fact with a false or misleading impression, the State is entitled to counter with evidence to refute the impression created by the defendant and cure the misleading advantage." *State v. Carlson*, 146 N.H. 52, 56 (2001) (quotation omitted).

■ In this case, the defendant sought to introduce the fact that the witness had "bad feelings" toward the defendant while preventing the State from revealing to the jury the reasons for those feelings. To permit the defendant to elicit the fact that the aunt was biased against the defendant based on undefined "bad feelings" could create a false or misleading impression concerning the reasons for the aunt's bias. Moreover, it should be noted that although allowing the State to inquire as to the reason for the aunt's bias might elicit prejudicial evidence of the defendant's prior bad acts, it was the defendant who was trying to establish the aunt's bias because of those acts. The defendant, therefore, was left with the choice of whether to raise the issue of bias. This choice is constitutionally permissible because he was not forced to surrender a constitutional right, but rather was merely prevented from selectively introducing evidence to create a misleading advantage. In light of the above, we hold that the trial court's exercise of discretion in allowing the State to make a limited inquiry into the reasons for C.B.'s aunt's bias is sustainable. *Carlson*, 146 N.H. at 56; *cf. State v. Lambert*, 147 N.H. 295, 296 (2001) (explaining unsustainable exercise of discretion standard).

The third issue is whether the trial court erred by denying the defendant's request for a jury instruction on accident. Though "accident" is not a recognized defense under the Criminal Code, we have held that "an instruction on accident should be given if the theory is supported by some evidence." *State v. Russo*, 140 N.H. 751, 753 (1996). Requests for specific instructions must be submitted "so as to allow the trial court ample time to review them and to decide whether they should be included in the charge." *State v. Letourneau*, 133 N.H. 565, 567 (1990) (quotation, brackets and emphasis omitted). Under the superior court rules, such a request cannot be submitted after the commencement of trial except for good cause shown. SUPER. CT. R. 62, 72.

■ The defendant argues that the trial court erred by refusing to give an instruction on accident because there was evidence to support such a defense. Our review of the transcript, however, shows that the defendant's request for an accident instruction was first made during a bench conference after closing arguments and jury instructions. The defendant offers no justification for delaying his request until the last possible minute before jury deliberations. We conclude that the defendant's request for an accident instruction was not made in a timely manner and, therefore, the trial court did not err by denying the defendant's requested instruction.

The defendant's final argument is that the trial court committed reversible error by refusing to orally instruct the jury on the definition of reasonable doubt during the closing instructions to the jury. The purpose of jury instructions is to explain the rules of law applicable to a case. *State v. Jackson*, 141 N.H. 152, 153 (1996). When jury instructions are challenged, "[w]e review the challenged instructions in the context of the entire charge and all of the evidence to determine whether the trial court adequately stated the relevant law." *State v. Bashaw*, 147 N.H. 238, 240 (2001) (quotation and ellipsis omitted). We will not reverse a conviction "unless the instructions did not fairly cover the issues of law in the case." *Id.* (quotation omitted).

■ Here, the trial court gave jury instructions prior to opening statements, as well as at the close of the evidence. The court's initial charge explained, in detail, the applicable burden of proof and the definition of reasonable doubt. At the close of the evidence, the court once again instructed the jury that the charged offense must be proven beyond a reasonable doubt. Although the court did not reinstruct on the definition of reasonable doubt at that time, the court provided the jury with a written copy of both sets of instructions. Although the better practice is to instruct the jury on the definition of reasonable doubt during final instructions, we

find that the jury instructions fairly and adequately covered the issues of law in this case. We hold, therefore, that the trial court did not err by refusing to repeat its instruction on the definition of reasonable doubt.

*Affirmed.*

BRODERICK, J., sat for oral argument but did not take part in the final vote; BROCK, C.J., and NADEAU and DALIANIS, JJ., concurred.