NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Rockingham
No. 2015-0484


THE STATE OF NEW HAMPSHIRE

v.

ABRAHAM DEPAULA

Argued: January 17, 2017
Opinion Issued: June 22, 2017

Joseph A. Foster, attorney general (Sean R. Locke, assistant attorney general, on the brief and orally), for the State.


Christopher M. Johnson, chief appellate defender, of Concord, on the brief and orally, for the defendant.

LYNN, J. The defendant, Abraham DePaula, appeals his convictions, following a jury trial in Superior Court (Delker, J.), on one count of burglary, five counts of theft by unauthorized taking, and two counts of conspiracy to commit theft by unauthorized taking. See RSA 635:1 (2007); RSA 629:3 (2016); RSA 637:3 (2016). On appeal, the defendant argues that the trial court erred when it: (1) ruled that his testimony opened the door to evidence of his alleged involvement in an unrelated homicide; (2) denied his motion in limine to preclude the State from introducing testimony regarding physical and sexual assaults that occurred during the burglary; (3) allowed the State to introduce

lay testimony from custodians of cellular telephone records regarding the range of cell towers; and (4) sentenced the defendant on both conspiracy to commit theft convictions. We affirm in part and vacate in part.

I

The jury could have found the following facts. At approximately 3:30 p.m. on July 18, 2011, two armed men entered J.U.'s house in Hampstead. J.U and his friend D.C. were in the house at the time. The intruders blindfolded and beat the two, while demanding to know where J.U. kept his guns. J.U. led one assailant to a locked room where he kept some guns and unlocked the room. Dissatisfied with the guns located in the room, the intruders demanded more guns. J.U. told them that he had no other guns in the house. At some point, D.C. was bound and taken into the bathroom, where she was sexually assaulted by one of the assailants. The other assailant started to carve his name into J.U.'s back before being stopped by the first assailant. Neither J.U. nor D.C. could identify the assailants who entered the house. Both testified, however, that they believed a third person entered the house at some point; D.C. testified that she "could hear somebody at the front door handing stuff out and a little bit of whispering," while J.U. testified that a third person was "moving stuff out of the back room." After approximately forty minutes, the intruders left. J.U. broke free of his bonds, went outside, and got help from a passerby who called the Hampstead Police.

The defendant and several other individuals were eventually charged with participation in the home invasion. At the defendant's trial, the State presented evidence that Avery Walker, Holli Soltish, Angel Sanchez, Max Menagerman, and the defendant conspired to break into J.U.'s home to steal guns. Soltish testified that she became aware of J.U.'s gun collection through a friend and described it to Walker, who enlisted the defendant, Menagerman, and Sanchez to help steal and sell J.U.'s guns.

The group made several trips to J.U.'s home in preparation for the home invasion. The first trip occurred on July 11, when Soltish approached J.U. at his home while the rest of the group waited in a nearby car. The second trip occurred on July 16, when the defendant, Walker, Menagerman, and Sanchez, in an effort to learn who occupied J.U.'s home, approached the home posing as landscapers and feigned confusion about the location of a nearby residence. J.U. testified that he became suspicious as a result of the July 16 visit and moved a number of his guns and valuables to another location.

The State's theory at trial was that Menagerman, Sanchez, and the defendant committed the home invasion, with Menagerman and Sanchez entering the residence while the defendant primarily remained outside in a car. The State further asserted that Menagerman sexually assaulted D.C., and Sanchez assaulted J.U. In support of its theory, the State presented testimony

2

from Aneudys Menendez, who said that, after the crime, the defendant and Sanchez showed him firearms that they had stolen from J.U.'s home. Menendez also testified that the defendant, Sanchez, and Menagerman asked him to find buyers for the stolen guns.

Before trial, the defendant moved to exclude from trial all testimony or evidence regarding the sexual assault against D.C. and the physical assault against J.U. He asserted that evidence of the assaults was inadmissible because he had not been charged with any crime relating to the assaults, and because the testimony would be inflammatory in nature and was, therefore, unfairly prejudicial. The State objected, arguing that the assaults were inextricably intertwined with the acts charged against the defendant, and therefore, were relevant and integral to J.U.'s and D.C.'s testimony.

After a hearing, the court concluded, pursuant to New Hampshire Rules of Evidence 401 and 403, that certain testimony related to the sexual assault was probative because it placed Menagerman at the scene of the crime and allowed the jury to better evaluate D.C.'s and Menendez's testimony. In addition, it found that testimony regarding the sexual assault was necessary "to complete the story" of the burglary because the assault occurred contemporaneously with the home invasion and explained the high degree of trauma that D.C. experienced. (Quotation omitted.) Although the court acknowledged that the testimony was prejudicial, it concluded that the prejudice would be mitigated by providing a limiting instruction to the jury, as well as by the fact that the defendant was not accused of committing the assault, which he asserted was "vastly different in nature" from the crimes with which he was charged. The court determined that the evidence relating to the physical assault of J.U. was probative for similar reasons, and concluded that the same mitigating factors would cure any prejudice created by J.U.'s testimony about that assault.

At trial, the court gave the following limiting instruction after J.U. testified regarding the physical assault:

> Relating to the testimony that this witness and other witnesses have and will provide in this case about the injury to [J.U.'s] back with the knife, and the sexual assault of [D.C.] So as I've already told you in this case, [the defendant] is not charged with either of those crimes.

> The reason that I have allowed that evidence into this case, despite the fact that he's not charged with those crimes, is to allow you to evaluate [J.U.'s] and [D.C.'s] testimony, their perceptions, memory, emotional state at the time of the observations they made in this case so that you can properly understand what was happening from each of their testimony to them. The testimony is

to be considered by you only as it impacts these two witnesses' perceptions, memory, and the reliability of their testimony.

So that's the reason I'm allowing that evidence in, and that's the only reason you should use that evidence for that limited purpose in this case.

The trial court reminded the jury after D.C.'s testimony regarding the sexual assault that such testimony was admitted only for the purpose of evaluating D.C.'s testimony, and that the defendant had not been charged with those crimes.

Also prior to trial, the defendant filed a motion in limine challenging the admissibility of evidence concerning the location of the cell towers that serviced the conspirators' cell phones at certain times, claiming that such evidence constituted expert testimony and could not be introduced by non-expert custodians of cell phone records. After a hearing, the court denied the motion, finding that general "testimony of how calls attach to cellphone towers is within the ken of the average jury" based on the ubiquity of cell phones and smart phones in society. (Quotation omitted.)

The State presented testimony at trial from three cell phone records custodians who were employed at major cell phone service providers. The first custodian testified about the collection and storage of cell phone records. The other two custodians discussed the average and maximum ranges of the cell towers used by their respective companies, as well as the basic method by which cell phones connect to cell towers. The State also presented testimony from an analyst from the New England State Police Information Network, who reviewed the cell phone records and compared the cell site data to company-provided maps of the cell tower network. With this information, the analyst created maps that indicated which cell towers were used by the phones of the defendant, Menagerman, and Sanchez on July 16 and 18. Based upon the cell tower information, the maps indicated that the three individuals' cell phones were in the vicinity of Hampstead on July 16 as well as at the time of the July 18 home invasion.

The defendant presented an alibi defense, claiming through his own testimony and that of other witnesses that he had spent most of July 18 at the hospital with his wife, who was giving birth to their child. The defendant admitted to being present on the July 11 Hampstead trip, but testified that he thought the purpose of the trip was to help the defendant "buy an illegal gun." He testified that Sanchez translated what Soltish said, and told him that Soltish "knew someone who had a license to purchase guns."

In response to the defendant's testimony about his actions on July 11, the State argued that the defendant had opened the door to evidence of

4

unrelated criminal activity that refuted his claim to be an unwitting accomplice in the events of that day.  The trial court agreed, and allowed the State to present rebuttal evidence of an unrelated murder that occurred in Manchester later on July 11 or early the following morning, in which the defendant, Menagerman, and Sanchez allegedly participated.  The rebuttal evidence consisted of records reflecting that the cell phones of the defendant, Menagerman, and Sanchez were in Manchester around the time of the murder, and testimony by Menendez that the defendant and Sanchez, later joined by Menagerman, had bragged to him about committing the murder while they and Menendez watched a television news story reporting on that crime.  At the close of all the evidence, the trial court gave the following limiting instruction regarding the evidence of the murder:

> So ladies and gentlemen, I just had a conversation here about instructions that before the parties rested in the case that I had intended to give you that I didn't [a]bout the use of the Manchester homicide evidence that you heard in the State's rebuttal case.
>
> The evidence was introduced for the purpose of rebutting the Defendant's direct testimony during . . . this trial.  You are not allowed to use the evidence about his affiliation, if you do find that there is one, to that Manchester case to conclude that if you conclude that he was involved in that case, you can't then say well he -- if he did that, he must have done the Hampstead case.
>
> The evidence was introduced solely for the purpose of rebutting his testimony.  You can't infer that because he may have been involved in other bad conduct, he must have committed the Hampstead case.  That's -- the evidence was introduced with a very limited purpose of rebutting his testimony.
>
> And one more point on that . . . , ladies and gentlemen, there are no pending charges in connection with the Manchester case. So no one has been charged in connection with that Manchester homicide.

Following a nine-day trial, the defendant was convicted of all charges. This appeal followed.

## II

We first address the defendant's assertion that the trial court erred in ruling that his testimony about the July 11 visit to Hampstead opened the door to rebuttal evidence that he was involved in the Manchester homicide.  The defendant argues that his testimony was not misleading, and that, even if his testimony was misleading, the court erred by allowing the rebuttal evidence

5

because it was unrelated to the acts for which the defendant was charged and because it relied upon an improper propensity inference.  Moreover, the defendant contends that the rebuttal evidence — specifically the testimony that he allegedly committed a murder and bragged about it afterwards — is so unfairly prejudicial that even the trial court's curative instructions could not adequately limit the risk of unfair prejudice.

We have usually considered the evidentiary doctrine of "opening the door" in the context of two subsidiary doctrines.  See State v. Gaudet, 166 N.H. 390, 396 (2014).  The first, which we have described as the doctrine of "curative admissibility," arises when inadmissible prejudicial evidence has been erroneously admitted by one party, and the opposing party seeks to introduce other evidence to counter the prejudice.  Id.  The second, which we have called the doctrine of "specific contradiction," applies more broadly to situations in which a party introduces admissible evidence that creates a misleading advantage for that party, and the opposing party is then permitted to introduce previously suppressed or otherwise inadmissible evidence to counter the misleading advantage.  Id.  With respect to this prong, the fact that the "door has been opened" does not permit all evidence to "pass through" because the doctrine is intended to prevent prejudice and is not to be subverted into a vehicle for the introduction of prejudice.  Id. (quotation omitted).  The specific contradiction doctrine is at issue in this case.

 "The trial court is in the best position to gauge the prejudicial impact of particular testimony."  Id. (quotation omitted).  Consequently, we review the trial court's decision to admit evidence under the "opening the door" doctrine using our unsustainable exercise of discretion standard.  State v. Nightingale, 160 N.H. 569, 579 (2010).  To prevail, the defendant must show that the trial court's decision was clearly untenable or unreasonable to the prejudice of his case.  See id.

The defendant asserts that his testimony at trial did not create a misleading impression because he did not characterize himself as a "wide-eyed innocent" who never agreed to commit criminal acts, but rather as merely an individual who was unaware of the criminal purpose of the July 11 trip.

We have previously held that the door can be opened by inferential conclusions that may be drawn from a witness's testimony.  See State v. Cannon, 146 N.H. 562, 565-66 (2001); State v. Carlson, 146 N.H. 52, 57-58 (2001).  In Cannon, the defendant was convicted of one count of aggravated felonious sexual assault.  Cannon, 146 N.H. at 563.  At trial, the complainant testified that she rejected the defendant's advances because she had a boyfriend, implying that she did not have sexual relations with men other than her boyfriend.  Id. at 563-64.  The defendant attempted to introduce testimony about an incident in which his cousin had consensual sex with the complainant one or two weeks prior to the alleged assault.  Id. at 564.  The trial

court excluded the testimony.  Id.  We reversed, concluding that the complainant's testimony regarding her reason for rejecting the defendant's advances directly affected the issue of consent and thereby opened the door for the defendant to submit rebuttal evidence on that new issue.  Id. at 565-66.

In Carlson, we concluded that the defendant's testimony that at some point during the evening of the assault he said, "I'm leaving.  This isn't me," could logically have been interpreted by the jury as an assertion that "it was not within his character to engage in sexual activity with girls under the age of legal consent."  Carlson, 146 N.H. at 57.  Thus, notwithstanding that there may also have been other reasonable interpretations of the statement, we held that the defendant had opened the door to admission of evidence demonstrating that he had previously had sexual relations with an underage girl.  Id. at 57-58.

The same reasoning applies here.  The defendant stated that he accompanied the group to Hampstead on July 11 to purchase a gun after Sanchez had told him that Soltish had said that she knew "someone who had a license to purchase guns."  The dissent emphasizes the fact that the defendant said he went to Hampstead to buy an illegal gun, asserting that this is significant because it refutes the notion that the defendant was attempting to portray himself as a wholly innocent person.  Although we acknowledge that the transcript of the defendant's testimony does reflect that he said "illegal" gun, there is reason to doubt that the transcript is accurate on this point.  A review of the transcript reflects that during the entire discussion between counsel and the court concerning the State's request to elicit evidence regarding the Manchester homicide no mention whatsoever was made about the defendant testifying that the gun he intended to buy was "illegal." Additionally, at the conclusion of that discussion, when the trial court explained that it was permitting evidence of the homicide to be admitted to contradict the defendant's testimony "that the trip to Hampstead was essentially an innocent trip to buy a gun from a licensed gun dealer," the defendant's counsel made no effort to clarify or correct the court's statement by referencing the fact that the defendant had testified he planned to buy an "illegal" gun.  Most importantly, nowhere in his appellate brief addressing the issue of the asserted error by the trial court in admitting evidence of the Manchester homicide does the defendant contend that the defendant testified the gun he allegedly traveled to Hampstead to buy on July 11 was "illegal," nor does he advance the position relied upon by the dissent — that his admission to seeking to purchase a supposedly "illegal" gun shows that he was not claiming to be in Hampstead on that date for an innocent purpose.

But even if we accept that the defendant did testify that he planned to buy an "illegal" gun, the evidence of the Manchester homicide was nonetheless highly probative of the defendant's credibility as to his knowledge of the purpose of the trip.  Although the defendant did not explicitly state that he

was, as the State claimed, a "wide-eyed innocent," the defendant's testimony intimated that he was "innocent" in the sense that he was unaware of the true purpose of the group's July 11 visit because of Sanchez's inaccurate translation of Soltish's statements. That testimony suggests that the defendant would not have travelled to Hampstead had he known the true purpose of the trip. This, in turn, could have left the jury with the impression that the defendant was ignorant of the conspiracy. Thus, by claiming that he thought the purpose of the trip to Hampstead on July 11 was to buy a gun from someone, the defendant injected a new issue into the case. The defendant had no obligation to describe his reasons for joining the group on this trip, nor was he required to create an impression of himself as a person who merely wanted to buy a gun (whether legal or illegal). Once he did so, however, he opened the door for the State to present evidence that rebutted the implications of his testimony.

For similar reasons, the defendant's next contention — that the evidence of the unrelated murder should not have been admitted because it does not specifically contradict his testimony that he did not understand the true criminal purpose of the July 11 trip — also is unpersuasive. The defendant argues that his testimony "could have been specifically contradicted by the testimony of another occupant of the car [indicating] that Sanchez accurately translated the conversation," rather than by testimony that the defendant "participated in another unrelated crime." Yet the issue is not merely whether Sanchez mistranslated the conversation. It is the defendant's testimony that he went to Hampstead to purchase a gun, which implies that he did not know about the conspiracy or the true purpose of the trip because he had been kept in the dark by his companions. That implication could be rebutted by evidence presented by the State showing that, only hours after the July 11 trip, the defendant committed a homicide in Manchester with two members of the conspiracy, Sanchez and Menagerman, and then bragged about it. There can be little doubt that a jury, upon learning that Sanchez was willing on the same day to participate in a murder with the defendant, would find such evidence highly probative in rebutting the defendant's implied assertion that Sanchez mistranslated the conversation to keep him from knowing the true criminal purpose of the July 11 trip. See State v. Donovan, 120 N.H. 603, 607-08 (1980); see also United States v. Pelletier, 666 F.3d 1, 5-6 (1st Cir. 2011) (when, through cross-examination of government witness, defense counsel created impression that defendant had legitimate sources of income and had nothing to do with delivery of marijuana, which just "mysteriously appeared" in buyer's car, trial court properly admitted evidence of defendant's prior drug convictions); United States v. Rodriguez, 215 F.3d 110, 119 (1st Cir. 2000) ("By offering evidence of a second [later] incident in which Santana [one of the defendants] was involved in a completed drug venture with some of the same participants, the government gave the jury a reason to view skeptically Santana's claim that he was just an innocent bystander who was 'merely

present,' but rather to conclude that he was a knowing and intentional participant in the crimes charged in the indictment.").

Finally, we turn to the defendant's claim that the court erred in allowing the evidence of the Manchester homicide because of its "extraordinarily high risk of unfair prejudice" that could not be mitigated by a limiting instruction. In support of his position, he cites several cases in which we held that the court's limiting instructions were insufficient to cure the taint of prejudicial evidence. See, e.g., State v. Ayotte, 146 N.H. 544, 549 (2001); State v. Pelkey, 145 N.H. 133, 137 (2000).

These cases, however, are factually distinguishable. None of them involved the "opening the door" doctrine; that is, none involved situations in which the State introduced rebuttal evidence to respond to an issue injected into the trial by the defendant's own testimony. Rather, in those cases, the State introduced the prejudicial evidence in the first instance. Compare Ayotte, 146 N.H. at 546-48, and Pelkey, 145 N.H. at 135, with State v. Wamala, 158 N.H. 583, 590 (2009), and State v. Taylor, 139 N.H. 96, 99-100 (1994). As we have recognized, when, as here, a party introduces admissible evidence that creates a misleading advantage for that party, the opposing party has a particularly strong interest in being able to refute such evidence. See State v. Blackstock, 147 N.H. 791, 797 (2002). Were the rule otherwise, a party could theoretically enjoy a license to make affirmative misrepresentations and commit perjury without fear of contradiction. See Taylor, 139 N.H. at 100; see also Blackstock, 147 N.H. at 797 (holding that trial court sustainably exercised its discretion in ruling that, if defendant chose to expose witness's bias against him, State would be permitted to elicit from witness basis for bias). Thus, we do not believe that the cases cited by the defendant are persuasive in the instant case.

As we have often noted, evidence is not precluded from admission merely because it is prejudicial, in the sense that it tends to prove facts that are detrimental to the opposing party's position, for in this sense all relevant evidence offered by the prosecution is meant to be prejudicial. See Nightingale, 160 N.H. at 574; State v. Cassavaugh, 161 N.H. 90, 98 (2010). Instead, to be excluded, the evidence must be unfairly prejudicial, which typically means that it has an undue tendency to provoke a decision by the jury based upon emotion, anger, bias, sympathy or some other grounds aside from the "established propositions" of law in the case. See Nightingale, 160 N.H. at 574-75; Cassavaugh, 161 N.H. at 98. Although we acknowledge that admission of evidence of the Manchester homicide carried a risk of undue prejudice, we believe the risk was significantly reduced by the trial court's clear and proper limiting instructions, which the jury is presumed to have followed, explaining that the sole purpose of introducing the testimony relating to the Manchester murder was to rebut the defendant's testimony, and that this evidence could not be used for the purpose of inferring that the defendant must have

committed the crimes at issue because he had a propensity to engage in criminal conduct. See Gaudet, 166 N.H. at 397.

Accordingly, we conclude that the trial court's decision to admit the evidence about the Manchester homicide was not an unsustainable exercise of discretion.

III

The defendant next argues that the trial court erred under New Hampshire Rules of Evidence 401 and 403 by admitting evidence of the physical and sexual assaults against J.U. and D.C. Although the defendant concedes that the evidence of the physical and sexual assaults possesses some probative value under Rule 401, he maintains that the probative details of the assault, such as D.C.'s testimony that her attacker repeatedly sneezed while attacking her, could have been discussed without reference to the assaults themselves. Moreover, the defendant asserts that the minimal degree of probative value was substantially outweighed by the danger of unfair prejudice because of the heinous and extreme details of the assaults, which were highlighted by statements in the State's closing argument. Finally, the defendant argues that the three considerations offered by the court in its decision, including its limiting instruction, were insufficient to cure the inflammatory nature of the evidence.

According to Rule 401, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.H. R. Ev. 401. Under Rule 403, however, even "relevant . . . evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.H. R. Ev. 403; see State v. Willis, 165 N.H. 206, 216 (2013). As we explained, unfair prejudice is not mere detriment to a defendant from the tendency of the evidence to prove guilt, in which sense all evidence offered by the prosecution is meant to be prejudicial. Willis, 165 N.H. at 216. Rather, the prejudice required to predicate reversible error is an undue tendency to induce a decision against the defendant on some improper basis, commonly one that is emotionally charged. Id. Among the factors we consider in weighing the evidence are: (1) whether the evidence would have a great emotional impact upon a jury; (2) its potential for appealing to a juror's sense of resentment or outrage; and (3) the extent to which the issue upon which it is offered is established by other evidence, stipulation, or inference. Id.

"The trial court is in the best position to gauge the prejudicial impact of particular testimony, and what steps, if any, are necessary to remedy that prejudice." Id. (quotation omitted). Thus, we give the trial court broad latitude

10

when ruling on the admissibility of potentially unfairly prejudicial evidence, and we will not disturb the trial court's decision absent an unsustainable exercise of discretion.  Id.

To perform the balancing required by Rule 403, we first consider the probative value of the evidence.  See Wells, 166 N.H. at 80.  Here, the evidence relating to the assaults was relevant to the identities of the individuals who participated in the conspiracy with the defendant.  As the trial court found, because one of the assailants carved "what could be the beginning of an 'A'" into J.U.'s back, the testimony about the physical assault was probative of Sanchez's identity as one of the co-conspirators.  Similarly, the fact that D.C.'s assailant repeatedly sneezed in the bathroom containing a cat box connects Menagerman, who is allergic to cats, to the conspiracy and burglary.

Moreover, as the trial court found, the assaults were contemporaneous to and inextricably intertwined with the home invasion.  See id. at 78 (explaining that when evidence of "other act" and evidence of crime are inextricably intertwined, "other act" evidence is admissible because "events do not occur in a vacuum, and the jury has a right to hear what occurred immediately prior to and subsequent to the commission of the charged act so that it may realistically evaluate the evidence" (quotation omitted)).  As the trial court noted, the reliability of witness testimony is always relevant, and the evidence of the assaults was necessary in order for the jury to understand the trauma that D.C. and J.U. experienced, and how that trauma affected their observations of the home invasion.  See State v. Germain, 165 N.H. 350, 359 (2013), modified in part on other grounds by State v. King, 168 N.H. 340, 345 (2015).  It is doubtful that the victims could have excluded the assaults from their retelling of the home invasion without appearing overly emotional, which may have jeopardized their credibility with the jury.  Cf. State v. Giles, 140 N.H. 714, 718-19 (1996) (noting that the witness's tone of voice and demeanor are two useful tools in the jury's assessment of credibility).  Thus, the testimonies of the assaults carried a high degree of probative value.

We next consider whether the danger of unfair prejudice to the defendant from the admission of this testimony substantially outweighed its probative value.  See Wells, 166 N.H. at 80.  The evidence about the assaults undoubtedly carried the potential to inflame the jury against the offenders because of the nature of those crimes.  Yet the defendant did not participate in the assaults and, notwithstanding the defendant's close connection to the assailants and his possible presence in the house during some of the time when the assaultive conduct occurred, there was no evidence that he witnessed or knew of either of the assaults.  Furthermore, the dissimilarity between the conduct attributed to the defendant, on the one hand, and the far more egregious conduct attributed to Sanchez and Menagerman, on the other, lessened the risk of unfair prejudice.  Although we recognize that there are cases in which a limiting instruction cannot sufficiently reduce the risk of

11

unfair prejudice, see Pelkey, 145 N.H. at 137, here, the trial court's multiple limiting instructions, taken together with the above-mentioned considerations, sufficiently reduced the risk of unfair prejudice arising from the testimony about the assaults. Consequently, despite the prejudicial nature of the assaults, we cannot conclude that the evidence was so inflammatory as to substantially outweigh its probative value. Thus, we hold that the trial court did not unsustainably exercise its discretion in admitting evidence of the physical and sexual assaults.

IV

We next address the defendant's contention that the trial court erred in admitting evidence about the range of cell towers. We review the trial court's ruling to determine whether it was an unsustainable exercise of discretion. State v. Gonzalez, 150 N.H. 74, 77 (2003). We will reverse the trial court "only if the appealing party can demonstrate that the ruling was untenable or unreasonable and that the error prejudiced the party's case." Id. (quotation omitted).

The defendant argues that details pertaining to a cell phone tower's operation, "especially . . . the maximum radius of cell phone towers and the selection preference for the nearest tower, did not fit within the definition of lay testimony," and thus constituted expert testimony, which the records custodians who appeared at the trial were unqualified to provide.[1]

New Hampshire Rule of Evidence 701 states that opinion testimony by lay witnesses must be "limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the testimony or the determination of a fact in issue." N.H. R. Ev. 701. Conversely, expert testimony involves "matters of scientific, mechanical, professional or other like nature, which requires special study, experience, or observation not within the common knowledge of the general public." Gonzalez, 150 N.H. at 77 (quotation omitted).

Although this issue is one of first impression for this court, courts in other jurisdictions have addressed it, and several have "treated historical cell site data analysis as proper lay testimony under certain conditions." State v. Johnson, No. 16-0265 2017 WL 878720, at *8 (W. Va. Mar. 2, 2017).[2] We note

---

[1] The State argues that "certain aspects" of the defendant's argument were not preserved for our review, specifically his arguments relating to the testimony about the maximum range of the cell towers and the fact that cell phones attach to the closest available tower. However, the record establishes that the defendant objected to this testimony in a motion in limine, reiterated those concerns in a motions hearing before the court, and then renewed his objection at trial. Thus, we hold that the defendant's argument is preserved for our review.

[2] See, e.g., United States v. Graham, 796 F.3d 332, 364-65 (4th Cir. 2015), adopted in relevant part by 824 F.3d 421, 424 n.1 (4th Cir. 2016), appeal docketed, No. 16-6308 (U.S. Oct. 4, 2016);

that Federal Rule of Evidence 701 is similar to our state rule, compare Fed R. Evid. 701 with N.H. R. Ev. 701, and, therefore, we look to federal cases for guidance. In United States v. Kale, 445 F. App'x 482 (3d Cir. 2008), the court held that a cell phone records custodian's "limited discussion of the operation of cell phone towers" did not constitute expert testimony because it consisted of "reading and interpreting [the defendant's] cell phone records, including records detailing the locations of cell towers used to carry out his phone calls." Kale, 445 F. App'x at 485.[3] The court concluded that "a person of average intelligence would almost certainly understand that the strength of one's cell phone reception depends largely on one's proximity to a cell phone tower." Id. Furthermore, the court found that the custodian possessed sufficient "personal knowledge" regarding the operation of cell towers because of his training and experience. Id. (quotation omitted).

We have previously found that individuals can present limited lay testimony regarding matters which, if discussed in detail, would require expert testimony. See, e.g., State v. Cochrane, 153 N.H. 420, 423 (2006). In Cochrane, for instance, the defendant appealed his conviction for driving while intoxicated. Id. at 420. He argued that the arresting police officer's testimony regarding the administration and interpretation of the Horizontal Gaze

---

United States v. Feliciano, 300 F. App'x 795, 801 (11th Cir. 2008); Woodward v. State, 123 So. 3d. 989, 1016-17 (Ala. Crim. App. 2011); Perez v. State, 980 So. 2d 1126, 1131-32 (Fla. Dist. Ct. App. 2008). But see Wilder v. State, 991 A.2d 172, 197-200 (Md. Ct. Spec. App. 2010); Collins v. State, 172 So. 3d 724, 743-44 (Miss. 2015); State v. Patton, 419 S.W.3d 125, 132 (Mo. Ct. App. 2013).

[3] The defendant cites United States v. Guerrero, 768 F.3d 351 (5th Cir. 2014), to support his claim that testimony regarding the "maximum range of cell phone towers" must be presented by an expert. In Guerrero, the Fifth Circuit Court of Appeals held that an expert witness was adequately qualified to "interpret[] the historical cell site information that indicated where [the defendant] was when he placed calls." Guerrero, 768 F.3d at 356-57, 365. However, the court did not elucidate whether the expert testified as to the precise location of the defendant (something which the trial court here acknowledged would require expert testimony), his general location in relation to the cell towers, or some other matter. See id. Absent such elucidation, Guerrero holds no persuasive value for the case at bar.

The defendant also relies on three state cases, most notably Wilder v. State, 991 A.2d 172, 198 (Md. Ct. Spec. App. 2010), to support his assertion. We find those cases unpersuasive. Wilder relied upon Md. Rule 5-702, which contains substantially different language than N.H. R. Ev. 702. See Wilder, 991 A.2d at 200. Compare Md. Rule 5-702 with N.H. R. Ev. 702. Wilder also followed prior Maryland precedent, which interprets the permissible bounds of lay testimony more restrictively than we have, as evidenced by our decision in Cochrane, discussed in the text. In the second case cited by the defendant, Wilson v. State, 195 S.W.3d 193 (Tex. App. 2006), the Texas Court of Appeals held only that a trial court did not err by admitting a cell phone records custodian's testimony because the witness possessed sufficient specialized knowledge to be qualified as a reliable expert. Wilson, 195 S.W.3d at 202. The pertinent issue was whether that particular witness qualified as an expert, not whether a cell phone records custodian could discuss, as a lay witness, elementary concepts relating to the range and operation of cell towers. See id. at 200-02. In the third case, State v. Manzella, 128 S.W.3d 602 (Mo. Ct. App. 2004), the Missouri Appeals Court affirmed the trial court's determination that the defendant was unqualified to provide expert testimony about cell towers based upon his "life experiences and ten years as a customer" of a cell phone provider. Manzella, 128 S.W.3d at 609.

Nystagmus[4] (HGN) test was expert testimony. Id. at 421. We acknowledged that the "scientific and neurological mechanisms behind the effects of alcohol on the nervous system and the phenomenon of nystagmus are specialized and highly technical and . . . [t]herefore, testimony regarding these mechanisms would qualify as expert testimony." Id. at 423. We held, however, that an officer's testimony regarding "(1) his or her training and experience in administering and scoring the HGN test based upon the National Highway Traffic Safety Administration (NHTSA) standards and guidelines; (2) the administration of the HGN test in a particular case; and (3) the results of the HGN test as established by the NHTSA standards and guidelines" constituted lay testimony. Id. (emphasis added). The defendant correctly points out that our conclusion in Cochrane arose partially from the officer's personal observations; however, his argument disregards the fact that the officer's observations during the HGN test were enabled by the officer's specialized training and experience. See id. at 423.

Given the cell phone records custodians' specialized training and experience interpreting cell phone records, we hold that the custodians could testify as lay witnesses because they possessed sufficient personal knowledge to discuss generally the means by which cell phones connect to the closest cell tower and the general ranges of cell towers. See Kale, 445 F. App'x at 485-86. Moreover, we agree with the trial court's conclusion that the ubiquity of cell phones and cell towers in society allows the average juror to understand the elementary concepts underlying the interactions between cell phones and cell towers. Such understanding is qualitatively different from understanding the scientific and neurological mechanisms of the effects of alcohol on the nervous system referred to in Cochrane, which are wholly beyond the ken of the average juror. Accordingly, we conclude that the trial court did not unsustainably exercise its discretion in admitting the records custodians' testimony regarding the range of cell towers.

V

Finally, the defendant asserts that the trial court erred in sentencing him on both of the conspiracy indictments. Although the State's theory at trial was that the defendant and his co-conspirators participated in a single overall plan to commit the home invasion, of which the two reconnaissance or "casing" trips to Hampstead were a part, the State indicted the defendant for participating in two separate conspiracies. The first conspiracy indictment focused on the July 11 reconnaissance trip, while the second focused on the July 16 reconnaissance trip. The defendant argues that because the evidence showed that there was in fact a single conspiracy, the trial court's imposition of consecutive seven and one-half to fifteen year sentences for each conspiracy

---

[4] Nystagmus is an "involuntary, rapid, back-and-forth jerking of the eyes," and is associated with alcohol consumption. Cochrane, 153 N.H. at 421-22, 423.

14

conviction violates the double jeopardy protections provided by the United States and New Hampshire Constitutions.  Because the defendant did not present this issue to the trial court, he raises it before us as a matter of plain error.  See Sup. Ct. R. 16-A.

The State concedes that, under the facts and circumstances of this case, it was plain error for the trial court to sentence the defendant on both conspiracy convictions.  Accordingly, we vacate the defendant's conviction on one of the conspiracy indictments.

Affirmed in part; and
vacated in part.

DALIANIS, C.J., and HICKS, J., concurred; CONBOY and BASSETT, JJ., concurred in part and dissented in part.

CONBOY, J., concurring in part and dissenting in part.  I concur in the conclusions set forth in Sections III, IV, and V of the majority's opinion.  I disagree, however, with the majority's conclusion in Section II that the trial court did not err in ruling that the defendant's testimony about the July 11 visit to the Hampstead home, prior to the July 18 invasion of the home, opened the door to evidence that he was involved in a Manchester homicide.  Because I conclude that the admission of this testimony was error and that this error was not harmless, I respectfully dissent.

During trial, in response to defense counsel's question as to whether he had ever been to the "house in Hampstead," the defendant testified that he thought the purpose of the July 11 visit was to buy an illegal gun.  He said:

> Angel Sanchez had translated something that [Holli Soltish] had said.  I want[ed] to buy an illegal gun.  And she proposed to Angel that she knew someone who had a license to purchase guns.  And she brought me to this place in New Hampshire.  And she told me that she was going to talk to that person.

(Emphasis added.)  Subsequently, the State argued that the defendant's testimony portrayed him as a "wide-eyed innocent" with respect to the July 11 trip, and, therefore, the defendant had "open[ed] the door to the other acts," "to other information that he would have been aware of, because he was involved."

The trial court agreed with the State, ruling that the defendant's "testimony about being at the scene in Hampstead for a wholly innocent reason" opened the door to testimony about "his involvement in other cases." Specifically, the court ruled that the defendant had opened the door to allow the State

15

to show that he was fully part of this plan to engage in these home invasions, that he knew full well why they were going there, because he had done it before, and he did it again. And this is part of the pattern of conduct that he and the other two [conspirators] are engaged in.

The State subsequently asked the defendant whether he had been questioned about a murder in Manchester, and whether he was investigated "for [a separate] home invasion," but it did not question him about the details of his involvement in either crime. Later, the court ruled that it would not allow rebuttal evidence regarding other home invasions, but that it would allow evidence of the Manchester homicide. It stated that

the evidence the State proffered . . . with respect to the Manchester homicide is tightly tied to the purpose of the trip on July 11th. It is very close in time. It is within hours of that trip. There is specific information that the Defendant was involved in that both from [Aneudys] Menendez'[s] testimony that [the defendant] bragged about it afterwards and the affiliate, the timing of it, and the affiliation of the phones with that location where the homicide occurred. So I think that that evidence does go directly to contradict [the defendant's] testimony that that trip to Hampstead was essentially an innocent trip to buy a gun from a licensed gun dealer.

Thus, although the defendant testified that his goal on July 11 was to buy an illegal gun, the trial court nonetheless concluded that the defendant's testimony conveyed two possible misimpressions: (1) "that [the] trip to Hampstead was innocent," or (2) that the defendant "misunderstood the purpose of why they were going there." Accordingly, the trial court allowed the State, on rebuttal, to call Menendez.

Menendez testified that the defendant and Sanchez showed him a video "news clipping" about the homicide and "were just bragging about they murdered a man the previous night or something like in those terms." He testified that he learned that "[i]t was suppose[d] to be a . . . robbery, or a drug or a hit," but that "[t]he man reacted a way that they didn't like and they opened fire on him." He stated that "[t]hey showed [the video] to me like three times because they kept going back, showing me specific places where they stood and, you know, what the house looked like or the porch and, you know, this happened, that happened type of thing."

The majority concludes that, pursuant to the specific contradiction doctrine, the defendant's testimony opened the door to Menendez's testimony, as well as to other evidence regarding the Manchester homicide, by creating a misleading impression that "he did not know about the [theft by unauthorized

16

taking] conspiracy or the true purpose of the [July 11] trip because he had been kept in the dark by his companions." It explains that

> by claiming that he thought the purpose of the trip to Hampstead on July 11 was to buy a gun from someone, the defendant injected a new issue into the case. The defendant had no obligation to describe his reasons for joining the group on this trip, nor was he required to create an impression of himself as a person who merely wanted to buy a gun (whether legal or illegal). Once he did so, however, he opened the door for the State to present evidence that rebutted the implications of his testimony.

For the specific contradiction doctrine to apply, a party must introduce evidence that provides a justification, beyond mere relevance, for the opponent's introduction of evidence that may not otherwise be admissible. State v. Wamala, 158 N.H. 583, 589-90 (2009). The initial evidence must, however, have reasonably misled the fact finder in some way. Id. at 590. The rule thus prevents a party from successfully excluding evidence favorable to his opponent, and then selectively introducing this evidence for his own advantage, without allowing the opponent to place the evidence in proper context. State v. Bird, 161 N.H. 31, 35 (2010); see also State v. Carlson, 146 N.H. 52, 56 (2001). The fact that the door has been opened, however, "does not, by itself, permit all evidence to pass through. The doctrine is to prevent prejudice and is not to be subverted into a rule for injection of prejudice." State v. Trempe, 140 N.H. 95, 99 (1995) (quotation omitted).

Given all of the circumstances, I cannot conclude that the admission of the Manchester homicide evidence is supportable under the specific contradiction doctrine. The State contends that "a statement that the defendant did not understand the criminal purpose of the group's trip to Hampstead can create the impression that he did not understand the criminal purpose because he did not generally engage in criminal activity." However, the record contradicts this contention. The defendant testified that he "want[ed] to buy an illegal gun." (Emphasis added.) This testimony cannot fairly be characterized as an effort by the defendant to portray himself as someone who generally does not engage in criminal activity. Nor did he suggest, as the trial court concluded, that he was "at the scene in Hampstead for a wholly innocent reason."

I recognize that the majority correctly observes that the defense did not at trial, and does not on appeal, rely upon the defendant's testimony that he wanted to buy an illegal gun. Nonetheless, I cannot ignore the record testimony, and in the absence of evidence or even argument that there was a transcript error, I decline to so speculate. Further, I note that following the defendant's statement that his goal was to buy an illegal gun, the defendant

17

admitted upon questioning by his counsel, that he did not have a license, and had not applied for a license, to carry a gun in Massachusetts.

Even assuming, however, that the defendant did not use the word "illegal" in referring to the gun he planned to purchase, and that his testimony created a misleading impression regarding his understanding of the purpose of the July 11 trip to Hampstead, I do not believe that Menendez's testimony regarding a subsequent, unrelated homicide placed the defendant's testimony in its "proper context" or otherwise dispelled that misleading impression. See State v. Lopez, 156 N.H. 416, 423 (2007) (concluding that evidence that New Hampshire police officer did not see tears on defendant during interview would not have been placed in its proper context by introducing evidence that defendant cried at a different interview with New Jersey police on a different day). Unlike the cases upon which the majority relies, in which the proffered evidence specifically contradicted certain trial testimony, see State v. Cannon, 146 N.H. 562 (2001); Carlson, 146 N.H. at 52, Menendez's testimony regarding the defendant's alleged involvement in the Manchester homicide did not specifically contradict the defendant's testimony regarding his understanding of the purpose of the July 11 trip to Hampstead.

In Cannon, a sexual assault case, the complainant testified at trial that she told the defendant "no" and did not consent to sexual relations with him because she had a boyfriend. Cannon, 146 N.H. at 563-64. On appeal, the defendant argued that the trial court erred by excluding testimony that the complainant had had consensual sexual relations with someone other than her boyfriend one or two weeks prior to the alleged assault for which the defendant was being tried. Id. We agreed, concluding that, although the complainant "had no obligation to explain her reasoning for not consenting," once she offered an explanation at the request of the State, "the defendant was entitled to present evidence to refute her assertion." Id. at 565.

In Carlson, the defendant appealed his conviction of felonious sexual assault for unlawfully engaging in sexual penetration with a person who was under the age of sixteen. Carlson, 146 N.H. at 52. At trial, the defendant testified that, at some point during the evening of the assault, he said, "I'm leaving. This isn't me." Id. at 56 (quotation omitted). On appeal, the defendant argued that the trial court erred in ruling that this testimony had opened the door to testimony that he had previously engaged in sexual intercourse with an underage female. Id. at 54, 56. We concluded that the jury could have viewed his "statement as an assertion that his conduct and intentions that night were an anomaly and that he was not of a character to engage in those activities," id. at 57, and, therefore, the trial court did not err in ruling that he had opened the door to testimony that he had previously engaged in sexual relations with underage females, id. at 57-58.

18

Here, evidence that the defendant participated in a subsequent homicide with the theft conspirators did not specifically refute any misleading impression created by his testimony regarding his knowledge of the true purpose of the earlier Hampstead trip. Without more, it does not logically follow that, because there was evidence that the defendant participated in the homicide, he was aware of the purpose of the Hampstead trip. Cf. State v. Bassett, 139 N.H. 493, 500 (1995) ("The problem is that even if the accused entertained a certain intent during a similar uncharged incident, the accused may not have formed that intent on the charged occasion." (quotation and brackets omitted)).

As we have long held, and continue to maintain, evidence of other wrongs is inadmissible to prove disposition to commit such acts. See Trempe, 140 N.H. at 99 (addressing the admission of prior bad act evidence pursuant to the opening the door doctrine); see also N.H. R. Ev. 404(b). To be relevant, evidence of other bad acts must support a reliable inference, not dependent upon the defendant's character or propensity, that the defendant was aware of, and participated in, the charged acts as well as the uncharged acts. See Bassett, 139 N.H. at 499 (considering whether trial court erred in admitting evidence of defendant's prior conviction and sentence to prove intent to commit the charged crimes); see also N.H. R. Ev. 404(b). In this case, the inference the State sought to have the jury draw would be reliable only if there was sufficient support for a conclusion that the defendant's purported participation in the Manchester homicide (for which, at the time of trial, the defendant had not been charged) and his knowledge of the purpose of the trip to Hampstead were "closely connected by logically significant factors." Bassett, 139 N.H. at 499. Although temporal proximity between charged and uncharged bad acts is one factor to be considered, it cannot, alone, support a reliable inference of shared knowledge. See id.

The majority cites United States v. Pelletier, 666 F.3d 1 (1st Cir. 2011), and United States v. Rodriguez, 215 F.3d 110 (1st Cir. 2000), to support its conclusion that the Manchester homicide evidence properly rebutted the defendant's testimony about the July 11 trip. These cases, however, are factually distinguishable from this case.

In Pelletier, the defendant "was convicted of various counts related to his role in the importation, possession and distribution of marijuana." Pelletier, 666 F.3d at 3. On appeal, the defendant argued that admission of evidence regarding his prior drug-related convictions violated Federal Rules of Evidence 403 and 404(b). Id. at 5. The First Circuit Court of Appeals disagreed, concluding that defense counsel's "cross-examination of government witnesses opened the door to introduction of [the defendant's] prior [drug-related] convictions." Id. at 5. The court found that "defense counsel's questioning raised the specter of [the defendant] having legitimate sources of income, and of not taking part in the delivery of marijuana which 'mysteriously appeared' in

a buyer's car." Id. at 5-6. The court explained that, "[i]n the context of drug conspiracy cases, [it has] found prior convictions probative of knowledge and intent where they indicate a prior relationship between conspirators, and where they may be relevant to the defendant's knowledge of the presence of contraband and intent to distribute." Id. at 6 (citations omitted). The court found that, given the defendant's "apparent defense, these issues were squarely — even if only implicitly — placed before the jury," and, therefore, the district court did not err by admitting the defendant's prior convictions. Id.

Similarly, in Rodriguez, the defendants were convicted of conspiring to import marijuana and attempting to import marijuana. Rodriguez, 215 F.3d at 114. On appeal, they argued that the district court improperly admitted "testimony about other drug importation efforts in which one or more of them participated." Id. at 118. At trial, one of the defendants claimed that "he was just a fisherman who liked the waters off St. Thomas and who was innocently caught up with others who, if they intended a crime, had not told him their purpose." Id. at 119. The government introduced "evidence of a second incident in which [that defendant] was involved in a completed drug venture with some of the same participants." Id. The First Circuit Court of Appeals held that the district court did not err by admitting such evidence pursuant to Federal Rule of Evidence 404(b) "as possible proof of 'opportunity, intent, preparation or common plan, knowledge or absence of mistake, accident or other innocent reason' for the defendants' activities." Id. at 120.

In Rodriguez and Pelletier, the court upheld the admission of factually similar prior convictions to show opportunity, intent, preparation or common plan, knowledge or absence of mistake with respect to the crime charged, see Pelletier, 666 F.3d at 5; Rodriguez, 215 F.3d at 120, whereas, here, the Manchester homicide evidence — factually distinct from the theft conspiracy — was admitted solely to counter the implication that the defendant was unaware of the specific criminal purpose of the July 11 trip. I do not believe that the evidence of the Manchester homicide is "closely connected by logically significant factors" to the defendant's supposed understanding of the purpose of the July 11 trip as to support a permissible inference that contradicts any impression — misleading or otherwise — created by the defendant's testimony. See Bassett, 139 N.H. at 499. The record discloses no evidence that the defendant and the other members of the theft conspiracy also conspired to commit homicide. Nonetheless, even if there was evidence of a separate homicide conspiracy, such evidence would not rebut the impression that the defendant did not know the true purpose of the July 11 trip unless there was evidence that the homicide and the theft by unauthorized taking were part of a common plan or scheme. See Rodriguez, 215 F.3d at 119-20; Trempe, 140 N.H. at 99; see also N.H. R. Ev. 404(b). There was no evidence that the two crimes were part of a common plan or scheme. Under these circumstances, which also risked the jury deciding a homicide "trial within a trial," I conclude

that the relevance of the homicide evidence is based upon an improper character inference. See N.H. R. Ev. 404(b).

Further, any concern by the State that the defendant misled the jury as to his awareness of the true purpose of the July 11 trip presumably could have been addressed by the State calling another witness who participated in the trip to contradict the defendant's testimony. See Trempe, 140 N.H. at 99 (holding that trial court erred by allowing evidence of separate, unrelated interview in which the defendant was asked about a simple assault against his niece because, although defendant's testimony created misleading impression that he had not been contacted by any police officers, prosecutor could have dispelled impression in other ways). "Opening the door is one thing. But what comes through it is another. Everything cannot come through the door." Gordon v. United States, 783 A.2d 575, 587 (D.C. 2001) (quotation omitted). As we have stated, the purpose of the doctrine is to prevent prejudice and should not be subverted into a rule for injection of prejudice. Trempe, 140 N.H. at 99. Here, admission of the Manchester homicide evidence ran directly counter to this purpose. In my view, instead of rebutting the impression created by the defendant's testimony, the evidence served only to introduce prejudice. Because the Manchester homicide evidence did not fairly place in its proper context or specifically contradict any misleading impression created by the defendant as to his knowledge of the true purpose of the prior Hampstead trip, I would hold that the trial court erred by admitting evidence of the defendant's alleged involvement in the subsequent unrelated homicide.

The State contends that, even if the trial court erred, the error was harmless. In order to prove harmless error, the State must establish beyond a reasonable doubt that the erroneously admitted evidence did not affect the verdict. State v. Botelho, 165 N.H. 751, 756 (2013).

> The evaluation of whether this standard has been achieved involves consideration of the [other] evidence presented at trial and of the character of the inadmissible evidence itself. An error may be harmless beyond a reasonable doubt if the alternative evidence of the defendant's guilt is of an overwhelming nature, quantity, or weight, and if the inadmissible evidence is merely cumulative or inconsequential in relation to the strength of the State's evidence of guilt.

State v. Vandebogart, 139 N.H. 145, 157-58 (1994) (quotations and citations omitted).

Here, given the nature of the erroneously admitted evidence, I conclude that the State has failed to establish that its admission did not affect the verdict. I believe that Menendez's testimony regarding the defendant's participation in the homicide "may have tempted the jury to condemn the

21

defendant for uncharged felonies." State v. Carter, 140 N.H. 1, 5 (1995). It may also have induced the jury to conclude that because the defendant participated in the homicide, he probably participated in the theft by unauthorized taking conspiracy. See id. Moreover, given the "odious and provocative nature" of Menendez's testimony, I do not believe that the trial court's limiting instruction cured the prejudicial effect of the evidence. See id. Thus, I cannot conclude that the Manchester homicide evidence was "inconsequential in relation to the strength of the State's evidence of guilt." State v. Smith, 141 N.H. 271, 280 (1996) (quotation omitted).

Accordingly, although I believe that the evidence apart from the Manchester homicide evidence would be sufficient to support a finding of guilt, I cannot say, beyond a reasonable doubt, that the erroneously admitted evidence did not affect the verdict. See State v. Crosby, 142 N.H. 134, 139 (1997) ("In determining whether an error was harmless, we ask not whether the evidence, apart from that erroneously admitted, would support a finding of guilt, but whether it can be said beyond a reasonable doubt that the inadmissible evidence did not affect the verdict." (quotation omitted)); see also Smith, 141 N.H. at 280 (concluding that admission of defendant's prior bad checks convictions was harmless because it did not involve acts of an "odious or provocative nature, such as sexual assault or homicide" (quotation, citation and brackets omitted)). Therefore, I would reverse the defendant's convictions and remand for a new trial.

BASSETT, J., joins in the opinion of CONBOY, J.